UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
LOUIS DAIDONE,                                              :
                                                           :
                              Petitioner,                   :
                                                           :        08 Civ. 2545 (RMB)
            -against-                                       :
                                                           :        **DECISION AND ORDER**
UNITED STATES OF AMERICA,                                   :
                                                           :
                              Respondent.                   :
                                                           :
------------------------------------------------------------X

```
                  [stamp]
      USDC SDNY
      DOCUMENT
      ELECTRONICALLY FILED
      DOC #: _____
      DATE FILED: 8/24/09
```

## I.    Background

On or about March 14, 2008, Louis Daidone ("Daidone" or "Petitioner") filed a petition

for a writ of habeas corpus pursuant to 28 U.S.C. § 2255 ("Petition") against the United States of

America ("Government") seeking to vacate, set aside, or correct his June 29, 2004 sentence (by

this Court) of life imprisonment for reasons of alleged ineffective assistance of counsel.

(Petition at 1; see also Transcript of Proceedings, Sentencing Hearing held on June 29, 2004

("6/29/04 Sentencing Tr."), at 14.)  Petitioner's sentence followed a two week jury trial in which

he was convicted of:  (1) racketeering in violation of 18 U.S.C. § 1962(c); (2) racketeering

conspiracy in violation of 18 U.S.C. § 1962(d); (3) witness tampering by murder in violation of

18 U.S.C. § 1512; (4) conspiracy to make extortionate extensions of credit in violation of 18

U.S.C. § 892; and (5) conspiracy to collect extensions of credit by extortionate means in

violation of 18 U.S.C. § 894.   (See Judgment and Commitment Order, dated June 30, 2004

("Judgment").)[1]

---

[1] Defendant was sentenced to life imprisonment on Counts One, Two and Three and to 20 years
on each of Counts Four and Five.  (Judgment at 2.)

Following his sentencing, Petitioner appealed to the United States Court of Appeals for the Second Circuit.[2] The convictions and sentence were affirmed on or about December 15, 2006. See United States v. Daidone, 471 F.3d 371 (2d Cir. 2006). The Second Circuit determined, among other things, that "the government sufficiently demonstrated that each of Daidone's three predicate acts – the murder of [Thomas] Gilmore, the murder of [Bruno] Facciolo, and the loansharking – were related to the Luchese enterprise, as well as to each other. Such is sufficient to satisfy the relatedness requirement of RICO." Id. at 376. The Second Circuit also found that "Daidone's conviction on Count Three carried a minimum sentence of life in prison . . . [t]hus even after Booker the sentencing judge would have no discretion to grant the Defendant a lower sentence." Id. at 377.

In the Petition, Daidone argues that (1) his trial counsel was ineffective "for failing to challenge the prosecution's personal vouching for [its] principal witness [Alfonso D'Arco ("D'Arco")] in that "[t]rial counsel failed to contest the evidentiary receipt of the complete text of a 5K1.1 letter, [dated August 20, 2002 ("5K1 letter" or "5K letter")] written by the Government on behalf of its principal witness and to contest prejudicial references thereto during the Government's summations;" (Petition at 5.)[3] and (2) his appellate counsel was ineffective for

---

[2] John Mitchell, Esq. was privately retained to represent the Defendant on appeal. Mr. Mitchell is in private practice with a concentration in criminal law, civil practice, federal and state litigation, and appellate law. (http://www.martindale.com/John-W-Mitchell/481726-lawyer.htm) Daidone was represented at trial by three privately retained attorneys, namely, Anthony Lombardino, Christopher Chang, and Marc Jelen. Mr. Lombardino is in private practice (since 1960). Mr. Chang is in private practice (since 1979) with a concentration in litigation. Mr. Jelen was an associate of Mr. Lombardino.

[3] A "5K1.1 letter" is a letter written by the Government on behalf of a defendant who has provided "substantial assistance in the investigation or prosecution of another person who has committed an offense." (United States Sentencing Guidelines ("USSG") § 5K1.1.) In general, a defendant who receives a 5K1.1 letter has previously pled guilty pursuant to a "cooperation agreement" in which the defendant agrees to, among other things, provide truthful testimony at any trial or proceeding in which he is called as a witness. In this case, the cooperating witness

failing "to raise and advance the vouching issue on direct appeal despite obvious merit."
(Petition at 5.)  Petitioner also states: "Appellate counsel did not, on direct appeal, raise any issue
related to the [5K1.1] letter or its content."  (Petitioner's Memorandum of Law dated March 10,
2008 ("Pet. Mem") at 8.)

By Opposition dated May 5, 2008 ("Govt Opp"), the Government argues that the
statements in the 5K1.1 letter do not "improperly vouch for D'Arco's testimony in Daidone's
trial" since the "letter referred to D'Arco's assistance up to the date of the letter [2002]" and the
Daidone trial was in January 2004.  (Govt Opp at 23.)  The Government argues that "Daidone's
claim of ineffective assistance of trial counsel fails both the 'deficient representation' and the
'prejudice' requirements under *Strickland*, and should therefore be denied.  His claim that his
appellate lawyer rendered similarly ineffective assistance fails for essentially the same reasons."
(Govt Opp at 26-27.)   The Government states: "Defense counsel's consent to the admission of
the D'Arco 5K1.1 letter reflected a reasonable strategic decision to embrace evidence showing a
close relationship between D'Arco and the Government . . ."  (Govt Opp at 26.)

By Order dated November 6, 2008, the Court provided trial and appellate counsel for
Daidone with the opportunity to make written submissions.[4]  The Court received an affidavit
from Mr. Lombardino.  (See Affidavit of Anthony Lombardino, dated December 10, 2008

---

(D'Arco) received the 5K1.1 letter and was sentenced prior to his testimony at Daidone's trial.
(See e.g., Transcript of proceedings held on January 14, 2004 ("1/14/04 Tr.") at 384:7-16 (Q:
"Sitting here today, are there any criminal proceedings that are still pending against you?"
D'Arco: "None whatsoever."  Q: Is there any benefit at all that you expect to receive as a result
of your testimony here today?"  D'Arco: "None at all."  Q: "Is there anything that you fear might
happen to you if you lied in your testimony today?"  D'Arco: "Yes, I would be prosecuted for
the least perjury.  The agreement would be off.").)
[4] See, e.g., Sparman v. Edwards, 154 F.3d 51,  at 52 (2d Cir. 1998) ("We believe that a district
court facing the question of constitutional ineffectiveness of counsel should, except in highly
unusual circumstances, offer the assertedly ineffective attorney an opportunity to be heard and to
present evidence, in the form of live testimony, affidavits, or briefs.").  A full testimonial hearing
is not required.  See also Chang v. United States, 250 F.3d 79 (2d Cir. 2001).

("Lombardino Aff.").[5]  No submissions were made by Christopher Chang, Marc Jelen or John Mitchell.

**For the reasons set forth below, the Petition is denied.**

## II.    Legal Standard

Collateral relief under 28 U.S.C. § 2255 is available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995) (quoting Hill v. United States, 368 U.S. 424, 428 (1962)). "[T]o obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." United States v. Frady, 456 U.S. 152, 166 (1982).

To prove that counsel was ineffective, a petitioner must demonstrate first, that his attorney's conduct fell outside the wide range of professionally competent assistance, and, second, a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668 (1984). "Judicial scrutiny of counsel's performance must be highly deferential," as there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689.

"Strickland's two-prong test applies equally to claims of ineffective assistance of appellate counsel on a defendant's first appeal as of right." Evitts v. Lucey, 469 U.S. 387, 397 (1985)  "Failure to make a meritless argument does not amount to ineffective assistance." United States v. Arena, 180 F.3d 380, 396 (2d Cir. 1999).

---

[5] See also Transcript of [Curcio] proceedings held on April 25, 2003 ("4/25/03 Tr.") at 8:5-8: (Defendant: "Mr. Lombardino has been my attorney for 25 years now . . . and I'm satisfied with Mr. Lombardino as my attorney.")

"Vouching constitutes an assurance by the prosecuting attorney of the credibility of a Government witness through personal knowledge or by other information outside of the testimony before the jury." United States v. Walker, 155 F.3d 180, 184 (3rd Cir. 1998). "While the prosecution may not vouch for the credibility of its witnesses, the government is allowed to respond to an argument that impugns its integrity or the integrity of its case, and when the defense counsel have attacked the prosecutor's credibility or the credibility of the government agents, the prosecutor is entitled to reply with rebutting language suitable to the occasion." United States v. Carr, 424 F.3d 213, 227 (2d Cir. 2005) (internal quotations and citations omitted). "Such an attack may come in a defendant's opening statement.  If the opening sufficiently implicates the credibility of a government witness, we have held that testimonial evidence of bolstering aspects of a cooperation agreement may be introduced for rehabilitative purposes during direct examination." United States v. Cosentino, 844 F.2d 30, 33 (2d Cir. 1988).

## III.   Analysis

### (1) Trial Counsel

**Performance**

Petitioner argues that trial counsel was ineffective because: "Trial counsel did not contest the admissibility of the [5K1.1] letter, did not request redactions, object to the prosecutor's remarks in summation, or request a curative instruction from the trial judge." (Pet. Mem at 8.) In his affidavit, dated December 10, 2008, Petitioner's long time attorney, Mr. Lombardino, states: "Upon my review of said petition, a review of the trial transcript of the proceeding, and thorough reflection and conversations with my colleagues who assisted me at the trial, I agree with the Petitioner that my trial representation of Mr. Daidone relative to the 5K1.1 letter on behalf of D'Arco, constituted ineffective assistance of counsel." (Lombardino Aff. at ¶ 5.) Mr.

5

Lombardino adds: "Specifically, my failure to object to or contest the introduction into evidence on the Government's case-in-chief of the 5K1.1 letter of Alfonso D'Arco . . . was a critical error on my part, which greatly prejudiced my client.  Moreover failure to object to its use during the Government's summation was further critical error on my part;" (Lombardino Aff. at ¶ 6) <u>but</u> <u>see</u> 1/22/04 Tr. at 1292:7-9 where Mr. Lombardino advised the jury during summation that the Government attorneys "do not [and] cannot, vouch for the credibility of these witnesses.  These witnesses stand and fall depending upon your consideration."[6]

The Government counters: "Daidone's trial counsel's agreement to the admission of the [5K1.1] letter reflected his tactical effort to emphasize the Government's close relationship with D'Arco, in furtherance of his argument that the Government was willing to uncritically accept anything D'Arco said."  (Govt Opp at 1.)  "By allowing the jury to see what the Government had said to D'Arco's sentencing judge, the defense could argue – as it did – that the Government was not objective about D'Arco, but rather it unfailingly accepted D'Arco's version of events, regardless of D'Arco's obvious motives to curry favor with the Government on behalf of himself and his family."  (Govt Opp at 18.)

"*Strickland* requires a reviewing court to determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance . . . It will generally be appropriate for a reviewing court to assess counsel's overall performance throughout the case in order to determine whether the identified acts or omissions overcome the presumption that a counsel rendered reasonable professional assistance. Since there are countless ways to provide effective assistance in any given case, . . . unless

---

[6] Mr. Lombardino also acknowledges that "[t]he strategy of the defense was to attack the credibility of D'Arco in the hopes that the jury would not believe the things that he said in Court relative to the defendant Daidone." (Lombardino Aff. at ¶ 8.)

consideration is given to counsel's overall performance, before and at trial, it will be all too easy

for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a

particular act or omission of counsel was unreasonable." Kimmelman v. Morrison, 477 U.S.

365, 386 (1986) (internal citations and quotations omitted).

     Mr. Lombardino's overall performance before and during the trial was entirely

professional, thorough and appropriately aggressive.  He was an integral part of a very strong

legal team before and during the trial, which also included Mr. Chang and Mr. Jelen.[7]  Pre-trial

Mr. Daidone commented: "Mr. Lombardino has been my attorney for 25 years now . . . and I'm

satisfied with Mr. Lombardino as my attorney" (4/25/03 Tr. at 8:5-8.) and "I'm very satisfied

with my attorneys right now and I'll assume all the responsibilities that come along with it."

(4/25/03 Tr. at 12:12-14.)

     In addition, Defense counsel, including Mr. Lombardino, filed extensive and probative

pretrial motions, including: 1) a motion, dated February 10, 2003, seeking, among other things, a

bill of particulars, discovery material, Brady material, Giglio material, 404(b) evidence, and

---

[7] As referenced at page 4, before trial, the Court held a Curcio hearing on April 25, 2003
regarding Mr. Lombardino's representation of Petitioner in light of Mr. Lombardino's
contemporaneous representation of Earl Reynolds who was being prosecuted by the United
States Attorney's Office, Southern District of New York in a criminal matter before the Hon.
Lewis A. Kaplan. The Court held this hearing following its receipt of a letter application from
the Government, dated April 9, 2003, in which the Government asserted that it was making "this
request because of the dual representation by defense counsel, Anthony Lombardino, Esq., of
defendant Louis Daidone and another individual named Earl Reynolds.  As the Court knows,
Louis Daidone has been charged in this case with committing two murders and engaging in
loansharking activity as part of the Luchese Organized Crime Family, first as a soldier and, more
recently, as the Acting Boss of the family.  Earl Reynolds has been charged in a case pending
before Judge Kaplan, *United States v. Profeta et al.*, S2 02 Cr. 846 (LAK), with two counts of
extortion and is alleged to be an associate of the Luchese crime family.  Thus, the Government
believes that Reynolds could provide incriminating information about Daidone, and vice versa,
resulting in at least a potential conflict of interest for Mr. Lombardino in the continued
representation of both individuals." (Government Letter dated April 9, 2003 at 1.)  Following the
Curcio hearing, the Court found "that the waiver of potential conflict of interest is both voluntary
and knowing and [accepted the] waiver."  (4/25/03 Tr. at 17:17-19.)

disclosure of confidential informants; 2) a motion, dated April 14, 2003, seeking disclosure of

unnamed unindicted coconspirators; 3) motions, dated June 9, 2003 and October 9, 2003,

seeking a change in Mr. Daidone's bail status; and 4) a motion, dated August 26, 2003, seeking

dismissal of all of the charges. See, e.g., Transcript of proceedings held on April 25, 2003 and

October 14, 2003.

During trial, Petitioner's three trial attorneys each actively and professionally participated

in tandem and with excellent coordination on Petitioner's behalf. (See, e.g., Transcript of

proceedings held on January 21, 2004 ("1/21/04 Tr.") at 1055-1056 (application for a mistrial

made by Anthony Lombardino); at 1094-1117 (cross examination of Kenneth Cardona by

Christopher Chang); at 1135-1139 (Rule 29 motion made by Christopher Chang); at 1144-1145

(Rule 29 motion supplemented by Mark Jelen); at 1152-1177 (direct examination of Thomas

Padavona by Christopher Chang).) The opening and closing arguments were well and forcefully

made by Mr. Lombardino and he also conducted the cross examination of D'Arco. And, where,

as here, "a petitioner with multiple attorneys [asserts ineffectiveness, he] must, as a practical

matter, make a particularly strong showing that counsel's putative errors were" serious. United

States v. Lloyd, 983 F.Supp. 738, 743 (N.D. Ill.1997) (internal citations and quotations omitted).

Thus, even if Mr. Lombardino's trial prowess fell below the level which *Strickland* requires –

**[which it certainly did not]** – Mr. Chang and Mr. Jelen's "ability to monitor and correct any of

[Lombardino's alleged] mistakes makes [Daidone's argument] a tougher one to make." Id. The

record also reflects that trial counsel were very well prepared for the Government's reliance upon

8

Mr. D'Arco's testimony at trial because, among other reasons, the substance of D'Arco's

testimony was disclosed to defense counsel as early as September 2003.[8]

The Court cannot (even remotely) conclude that Mr.Lombardino's conduct fell outside a

wide range of competent assistance or that his overall performance was deficient. See, e.g.,

Guerin v. United States, No. 91 cr 601, 1998 WL 961908, at *6 (E.D. Pa Dec. 29, 1998) ("The

[C]ourt finds that Petitioner was represented by excellent attorneys who zealously represented

him at every stage of the proceedings, including sentencing. The [C]ourt finds that the

arguments Petitioner's attorneys did make were advanced with an eye toward his best defense.")

The Court also finds "that arguments not made, or not made as forcefully as Petitioner would

have liked, were strategic decisions that were well-grounded in the facts of this case and

certainly within the objective reasonableness of representation." Id.

Examples of Mr. Lombardino's preparedness to combat D'Arco's testimony and

D'Arco's cooperation with the Government are easily found in the record. In his opening

argument, Mr. Lombardino indicated he was fully prepared for Mr. D'Arco and advised the jury

as follows:

> These witnesses will tell you, and one, in particular, Mr. D'Arco, who the
> prosecution just referred to, Mr. D'Arco who in 1991 tells the FBI about these
> events. 1991. And you will hear that it wasn't until 2003, some 11 or 12 years
> later, that they bring these accusations against Louis Daidone. You will hear that
> Mr. D'Arco entered into a written agreement, and after he had this agreement,
> signed, sealed and delivered, it was then he decided that he would come forward
> and he would testify on behalf of the prosecution. And not only did he extract
> that promise, and that with a government-appointed lawyer, he extracted another

_____

[8] See, e.g. Transcript of proceedings held on September 17, 2003 ("9/17/03 Tr.") at 7:3-11, Mr.
Metzner: "[T]he production for Mr. D'Arco's 3500 material has included not only all of the
302's, that is the FBI reports of the interviews with Mr. D'Arco, but it includes specifically the
information about those additional acts that he is talking about in the Government's [August 27,
2003] letter. So the underlying evidence the [G]overnment would intend to produce about those
acts is reflected in the documents that have been produced and that the defense will have in
preparation for this trial."

9

agreement, and that agreement was that he would go into the [Witness Protection Program], him, his son, his family, and that's what they did. The government gave them that agreement and permitted them to go into that program.

You're going to hear that he, himself, this wonderful man who now has taken another outlook on life sends his own son to California to commit a murder. And you will hear that the murder that Mr. D'Arco sent his son to do was a capital murder, a case in which his son was eligible for the death penalty. You will also hear that because of this agreement or whatever went on between him and the prosecutors, the son was never even arrested.

(Transcript of proceeding held on January 12, 2004 ("1/12/04 Tr.") at 27:9-25; 28:1-5.)

D'Arco's 5K1.1 letter was admitted into evidence at trial (as Government Exhibit 3501-686R) at the end of the Government's direct examination of D'Arco. Although Mr. Lombardino did not object to its admission, Mr. Lombardino had called into question (by the time of its admission) the credibility of D'Arco during his opening statement. And, subsequent to the admission of the 5K1.1 letter, D'Arco's credibility was (again) vigorously attacked by Mr. Lombardino with these questions, among others, during cross examination:

i)    "Isn't it a fact that when you signed this [cooperation] agreement [dated May 14, 1992], you attempted to see it that you son would never go back to California and face the death penalty?" (1/14/04 Tr. at 266:13-15);

ii)    "You never went to prison either, did you?" (1/14/04 Tr. at 279:24);

iii)    "And you were able to pay that rent because you falsified certain applications, did you not?" (1/14/04 Tr. at 282:13-14);

iv)    "You sold narcotics?" (1/14/04 Tr. at 286:23);

v)    "And it didn't bother you, did it, Mr. D'Arco, that you committed perjury to a United States federal judge?" (1/14/04 Tr. at 300:20-21);

vi)    "You told us that you extorted throughout your life moneys from people?" (1/14/04 Tr. at 308:20-21);

vii)    "Now, you were also involved in counterfeiting, weren't you?" (1/14/04 Tr. at 309:20-21);

viii)    "And you are a murderer, correct, Mr. D'Arco?" (1/14/04 Tr. at 311:15);

ix) "You've also committed burglaries, have you not, Mr. D'Arco?" (1/14/04 Tr. at 312:5);

x) "And as a matter of fact, as you sit here today, isn't it a fact that you did, in fact, supply weapons to people which were used in a subsequent homicide?" (1/14/04 Tr. at 318:17-19);

xi) "And you have committed arsons in your life, have you not, Mr. D'Arco?" (1/14/04 Tr. at 332:4-5);

xii) "Now, there were a number of murders that you participated in, correct?" (1/14/04 Tr. at 338:10-11);

xiii) "Mr. D'Arco, we have asked you and you have told the jury about this contract where you were facing life without parole, and here you are today, and you would agree with me you never spent one day in jail, correct?" (1/14/04 Tr. at 370:16-19);

xiv) "And you were sentenced in the year 2002, correct" (1/14/04 Tr. at 371:7);

xv) "And your sentence was time served, correct?" (1/14/04 Tr. at 371:11).

To reinforce his point that "from the first day that [D'Arco] started to cooperate [he was] taken care of by the [G]overnment", (1/14/04 Tr. at 371:15-16), Mr. Lombardino introduced into evidence, as Defense Exhibit A, a letter from the Government to Mr. Lombardino, dated January 10, 2004, which revealed that D'Arco had been paid approximately $1,984,185.00 by the Government, including allowances for housing, relocation, medical care, travel (for debriefings and court appearances), etc. See 1/14/04 Tr. at 374. It is logical to conclude that trial counsel made a strategic choice not to object to the admissibility of the 5K1.1 letter as the letter supported the defense team's overall attack on D'Arco's credibility.

**Prejudice**

Petitioner argues, among other things, that: "The 5K1 letter, received in evidence, is such a blatant violation of trial protocol and fairness that it is hard to conceive of a document that could have caused greater prejudice to the defense." (Pet. Mem at 6.) The Government

counters, persuasively, that "Daidone was not prejudiced by the letter's admission, as the content

did little more than repeat D'Arco's litany of bad acts and explain the information available to

the judge at the time D'Arco was sentenced." (Govt Opp at 1-2.)  See also United States v.

Dambruck, 270 Fed. Appx. 30, at *33, 2008 WL 744237 (2d Cir. 2008) ("[D]efense counsel for

Valdez was able to inquire in detail into the truth-telling requirements, including the benefits that

Rodriguez hoped to receive for cooperating.").

Defendant was not prejudiced by the admission of the 5K1.1 letter. For one thing, the

Court does not conclude that the statements in the 5K1.1 letter amounted to impermissible

vouching.  As noted, the letter predated the Daidone trial by more than one and one half years

and it contained information regarding D'Arco's own crimes as well as D'Arco's prior

cooperation with the Government known to the defense.  And, the 5K1.1 letter could not contain

assurances by the Government as to the credibility of D'Arco's testimony at the Daidone trial.

And, "[n]owhere did the Government claim that the jury should believe D'Arco's testimony in

Daidone's trial solely because of his cooperation in earlier cases, or offer any personal opinions

regarding D'Arco's truthfulness in this case." (Govt Opp at 21.)  Moreover, as noted at page 6

above, Mr. Lombardino specifically acknowledged to the jury in his summation that the

Government attorneys "**do not, [and] cannot, vouch for the credibility of these witnesses**.

These witnesses stand and fall depending upon your consideration." (1/22/04 Tr. at 1292:7-9.)

(emphasis added)[9]  See  United States v. Steele, 283 Fed. Appx. 838, 2008 WL 2629160, at *2

_____

[9] In addition, the Court emphasized in its jury charges that the jury should evaluate with
"great care" the testimony of cooperating witnesses.  The jury was specifically instructed that
they - - not the lawyers or the Court - - were the determiners of the credibility of the witnesses.
The jury was charged, as follows:
> You also heard from government witnesses who testified that they actually
> committed crimes in the past, including the crimes charged in this indictment . . .

(2d Cir. 2008); Carr, at 229 (internal citations and quotations omitted) ("The prosecution's statement that both [witnesses] had already earned their 5K1.1 letters . . . could be understood as a simple, commonsense argument that a witness who has already agreed to testify against others would likely not jeopardize the potential benefits of providing such testimony – assuming it is truthful – by testifying untruthfully in another case. As such, the statements did not amount to the government's improper vouching . . ."); United States v. Warren, 306 Fed. Appx. 682, 2009 WL 89688, at *2 (2d Cir. 2009) ("Here, a fair reading of the summation indicates that the prosecutor was doing no more than noting that it was the jury's obligation to determine the credibility of the witnesses, and submitting that the witnesses were credible in light of the consistency of their testimony. That did not constitute improper vouching.").

Second, the evidence, apart from the 5K1.1 letter, against the Defendant was overwhelming. See Order dated June 18, 2004 and United States v. Daidone, 471 F.3d 371 (2d Cir. 2006). With regard to the racketeering counts, the Second Circuit Court of Appeals, stated: "In this case, the government sufficiently demonstrated that each of Daidone's three predicate acts – the murder of [Thomas] Gilmore, the murder of [Bruno] Facciolo, and the loansharking – were related to the Luchese enterprise, as well as to each other. Such is sufficient to satisfy the relatedness requirement under RICO." Daidone, at 376. With regard to counts one, four and five, in denying a Rule 29 motion, the Court ruled on June 18, 2004 that "the verdict was reached because the jury found the Government's witnesses to be credible and that Defendant was guilty

---

[S]uch testimony is of such a nature that it must be scrutinized with great care and viewed with particular caution when you decide how much of the testimony to believe . . . If you believe that the witness was motivated by hopes of personal gain, was the motivation one that would cause him to lie, or was it one that would cause him to tell the truth. Did these motivations color the witness' testimony.

(1/22/04 Tr. at 1405:3-5, 15-18; at 1406: 8-11.)

beyond a reasonable doubt." Order dated June 18, 2004 at 17.[10]  The Petitioner argues that the

5K1.1 letter "improperly informed the jury that D'Arco's testimony resulted in numerous

convictions, a fact which interfered with the jury's obligation to make an independent evaluation

of D'Arco's worth and credibility." (Pet. Mem at 6.)  The Government counters persuasively

that: "D'Arco's past cooperation was well-known to the jury independent of the contents of the

5K1.1 letter, and so its admission could not have prejudiced Daidone in any way, much less have

caused the jury to acquit him." (Govt Opp at 24.)  See United States v. Kennedy,  21 Fed. Appx.

82, at *87, 2001 WL 1411611 (2d Cir. 2001) ("We have reviewed Russell's other allegations in

support of his ineffective assistance claim that counsel permitted or failed to object to the

admission of the cooperation agreements of testifying cooperating witnesses, and failed to object

to portions of the prosecutor's summation, and conclude that these claims likewise lack merit".).

---

[10] During the trial, the Government showed,
    (i) Defendant was a member within the Luchese Crime Family and that it was involved in murder, labor racketeering, extortion, loansharking, gambling, etc. (Trial, January 13, 2004, at108:6-10; 20-23);
    (ii) loanshark customers paid points (interest) each week (Id., at 177:19-25);
    (iii) failure to repay a loan resulted in the threat of violence or actual violence (Id., at 178:13-21);
    (iv) loanshark customers paid as low as one point and as high as 10 to 15 points (interest) (Trial, January 15, 2004, at 584:24-25) ;
    (v) failure to repay a loan resulted in the threat of violence or actual violence (Id., at 585: 6-16);
    (vi) Louis Daidone became Acting Boss of the Luchese Crime Family (Id., at 881:18);
    (vii) Louis Daidone was tough when it was time to repay loans (Id., at 884:16-17) and was upset when an associate was 10 to 15 minutes late in repaying (Id., at 939: 19-21);
    (viii) prior to 1996, Daidone had approximately $80,000 in loanshark money on the street (Id., at 940:1-2, 5);
    (ix) Joseph Defede engaged in loansharking with Thomas Padavona (an associate of Louis Daidone) and Daidone in 1997 (Id., at 945:20-24);
    (x) Defede gave Padavona a $35,000 loan after Daidone approved the loan at three points (Id., at 947:13-17); the three points was split among the Luchese Crime Family; Padavona; and Daidone (Id,. at 948:3-4); the payments for the points continued until Defede's arrest in April of 199[8] (Id., at 948:8-19).
    Order dated June 18, 2004 at 17-19.

Third, the substance of the 5K1.1 letter was utilized as part of the defense strategy. During cross examination Mr. Lombardino highlighted D'Arco's prior testimony and prior cooperation when he asked D'Arco the following questions, among others: "And you have been with at least 10 prosecutors in the 13 years that you have been testifying, correct?" (1/14/04 Tr. at 281:1-2); "[Y]ou spent hundreds and hundreds of hours going over various facts with the prosecutors and the agents, correct?" (1/14/04 Tr. at 380:10-12); "And you have testified time after time in other cases, have you not?" (1/14/04 Tr. at 380:15-16.) Thus, it was not inappropriate for the Government to say in summation: "Mr. Lombardino wants you to think Al D'Arco had some kind of free pass, he didn't have to do anything to get the deal he got or it wasn't right, therefore, you shouldn't believe his testimony. If you read this [5K1.1] letter, you will see a description of all of the 12 trials he testified in, also the dozens of additional prosecutions assisted. Right on page 1 it says his assistance impacted well more than 50 cases in federal court and yielded at least $17 million in forfeitures to the government." (1/22/04 Tr. at 1277:2-10.)  See United States v. Arroyo-Angulo, 580 F.2d 1137, 1147 (2d Cir. 1978) ("[W]e find no error in the government's summation references to Rivas' cooperation agreement . . . Moreover, the cooperation agreement was a matter which the jury could properly consider in relation to the witness' credibility.") and United States v. Ramos, 279 Fed. Appx. 51, No. 06 Cr. 2414, 2008 WL 2179548 at *3 (2d Cir. May 27, 2008) ("The statements did not amount to the government's improper vouching . . . but simply constituted permissible argument . . . that the cooperating witnesses, whose veracity and credibility had been fiercely attacked by defense counsel, had no motive to testify falsely.") (internal citations and quotations omitted).

    **(2) Appellate Counsel**

Petitioner argues that "Appellate counsel did not, on direct appeal, raise any issue related to the [5K1.1] letter or its content." (Pet. Mem at 8.)  The Government counters that Daidone's appellate counsel "attacked Daidone's witness tampering conviction on several grounds, including a statute of limitations bar, a flawed jury charge, and improper venue; he challenged the sufficiency of the proof in support of a 'pattern of racketeering' regarding Daidone's racketeering convictions; he claimed that evidence of Daidone's other bad acts was improperly admitted; and that Daidone's loansharking convictions were tainted by spillover prejudice. Given the substantial unlikelihood of prevailing on any claim regarding admission of the 5K1.1 letter, Daidone's appellate counsel's decision to focus on other issues reflected a reasonable strategic approach to the appeal that cannot support an ineffective assistance of appellate counsel claim." (Govt Opp at 25-26.)

Daidone's ineffective assistance of appellate counsel claim fails. Wholly apart from the persuasive arguments regarding appellate counsel's strategic decisions cited above, because Petitioner's ineffective assistance of trial counsel claim is without merit, appellate counsel's decision not to pursue claims relating to the 5K1.1 letter on appeal was certainly not a significant omission. See Aparicio v. Artuz, 269 F. 3d 78, 99 (2d Cir. 2001) ("[P]etitioner's appellate counsel was not ineffective for failing to raise the meritless argument."). "Furthermore, the issues that were presented on appeal were far stronger than the ineffective assistance claim." Feliciano v. United States, No. 01 Civ. 9398 (PKL), 2004 WL 1781005, at *8 (S.D.N.Y. Aug. 10, 2004);

## IV.    Certificate of Appealability

The Court declines to grant a certificate of appealability as Petitioner has not "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); see Lucidore

16

v. N.Y. State Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000).  Any appeal from this order

would not be taken in good faith.  See 28 U.S.C. § 1915(a)(3).

**V.      Conclusion**

For the reasons stated herein, the Petition is denied.  The Clerk of the Court is

respectfully requested to close this case.

Dated:  New York, New York
        August 24, 2009

RICHARD M. BERMAN, U.S.D.J.