**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**UNITED STATES OF AMERICA**       :

- v. -       :       **S2 02 Cr. 1584 (RMB)**

**LOUIS DAIDONE,**       :
      **a/k/a "Louie Cross Bay,"**
      **a/k/a "Louie Bagels,"**       :

      **Defendant.**       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


**GOVERNMENT'S MEMORANDUM IN OPPOSITION**
**TO DEFENDANT LOUIS DAIDONE'S MOTION FOR**
**IMMEDIATE RELEASE PURSUANT TO 18 U.S.C. § 3582(C)**


**DAMIAN WILLIAMS**
**United States Attorney for the**
**Southern District of New York**
**Attorney for the United States**
**of America**


**KARL METZNER**
**Assistant United States Attorney**
**- Of Counsel -**

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | | |
| - v. - | : | S2 02 Cr. 1584 (RMB) |
| | | |
| LOUIS DAIDONE, | : | |
|    a/k/a "Louie Cross Bay," | | |
|    a/k/a "Louie Bagels," | : | |
| | | |
|            Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

### GOVERNMENT'S MEMORANDUM IN OPPOSITION
### TO DEFENDANT LOUIS DAIDONE'S MOTION FOR
### IMMEDIATE RELEASE PURSUANT TO 18 U.S.C. § 3582(C)

The Government respectfully submits this memorandum in opposition to defendant Louis Daidone's motion for immediate release pursuant to 18 U.S.C. § 3582(c). For the reasons that follow, Daidone's motion should be denied.

## I. Introduction

Defendant Louis Daidone, having served 18 years of his three concurrent life sentences and of his two 20-year concurrent sentences, asks this Court to order his immediate release. Daidone was not brought to justice for his crimes for over a decade, allowing him to enjoy the freedoms of life with his wife and children for many years—a privilege he refused to grant one of his murder victims when the man pled for one last chance to speak to his daughter before he was killed. Daidone's exemplary behavior while in prison and laudable efforts to remain involved in his family's life

are consistent with the perverse Mafia code that murders and other violent and serious crimes are "just business," which can be committed while simultaneously maintaining an outwardly-normal family life. In Daidone's case, his "business" was the Luchese Crime Family, and it included two brutal murders personally committed by Daidone himself. As a result, Daidone's life sentence was fully deserved and should not be reduced.

Indictment S2 02 Cr. 1584 (RMB) was filed on April 30, 2003, in five counts. Count One charged Daidone with participating in the conduct of the affairs of a racketeering enterprise, specifically, the Luchese Organized Crime Family of La Cosa Nostra, through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). Count Two charged Daidone with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). Count Three charged Daidone with witness tampering by murder, in violation of 18 U.S.C. §§ 1512(a)(1) and 2. Finally, Counts Four and Five charged Daidone with conspiring to make extortionate extensions of credit and to collect extensions of credit by extortionate means, respectively, in violation of 18 U.S.C. §§ 892 and 894.

Trial commenced on January 12, 2004, and concluded on January 23, 2004, when the jury convicted Daidone on all five counts, including all specifications charged in the racketeering counts.

On June 29, 2004, this Court sentenced Daidone principally to concurrent terms of life imprisonment on each of Counts One, Two, and Three, and 20 years' imprisonment on each of Counts Four and Five. The Court ordered that the terms of

imprisonment be followed by concurrent terms of five years' supervised release, and also imposed the mandatory $500 special assessment.

Daidone's conviction and sentence were affirmed by the Second Circuit by published opinion on December 15, 2006. *See United States v. Daidone*, 471 F.3d 371 (2d Cir. 2006). Daidone's subsequent collateral attack under 28 U.S.C. § 2255 was denied by this Court, and that denial was affirmed by the Second Circuit. *See Daidone v. United States*, 2009 WL 2611943 (S.D.N.Y. Aug. 24, 2009), *aff'd*, 422 F. App'x 26 (2d Cir. 2011).

Daidone is currently serving his sentence.

## II. Statement of Facts

To help this Court recall the complete picture of Daidone's criminal conduct leading to his life sentence, the Government reproduces the facts here in detail. Daidone committed two brutal murders as part of his participation in the activities of the Luchese Organized Crime Family, and also conducted a long-running lucrative loansharking operation that functioned even while he was in prison.

Louis Daidone was inducted into the Luchese Organized Crime Family in 1982. (Tr. 95).[1] Alfonso D'Arco was inducted at the same ceremony. In May 1988, Capo Paul Vario died, and D'Arco was promoted to Capo of Vario's crew. (Tr. 103). Daidone became a member of D'Arco's crew, and reported to D'Arco on his criminal enterprises. (Tr. 104; GX 101). Another member of D'Arco's crew was a Soldier named

---

[1] "Tr." refers to the trial transcript; "GX" refers to Government exhibits at trial; "A." refers to the appendix in Daidone's appeal from the denial of his Section 2255 motion, Second Circuit case number 09-3718.

Bruno Facciolo. (Tr. 108). During this time, D'Arco owned a restaurant in Manhattan named La Donna Rosa, where he held meetings with his crew, including Daidone. (Tr. 112-13, 115-19; GX 201-03, 207).

In May 1990, Luchese Boss Vic Amuso and Underboss Anthony "Gaspipe" Casso were facing indictment on charges relating to corruption in the replacement windows industry. (Tr. 126). As a result, they both went into hiding, and eventually named D'Arco Acting Boss. (Tr. 128-29). During the period that Amuso and Casso were on the run, they passed orders regarding Luchese business through D'Arco, by using prearranged pay telephones and codes. (Tr. 129). When D'Arco was made Acting Boss, he was specifically told that he could not induct new members or order murders without authorization from Amuso. (Tr. 130). As Acting Boss of the Luchese Family, D'Arco made Daidone his Acting Capo. (Tr. 62, 133; GX 102).

## A.    The Murder of Thomas Gilmore

Thomas "Red" Gilmore was a Luchese associate who made money primarily by stealing cars and operating a "chop shop," i.e., a shop where stolen cars were cannibalized for parts. (Tr. 137). Gilmore also operated a limousine service. (Tr. 137). In late 1988 or early 1989, D'Arco discussed Gilmore with Luchese Boss Vic Amuso during a meeting at the London Squire restaurant. (A. 8). Amuso told D'Arco that Gilmore was trying to set Amuso up with the police, and that Gilmore had robbed the

home of Bobby Amuso, Vic Amuso's brother. (A. 8). Amuso then instructed D'Arco to kill Gilmore. (A. 9).

D'Arco attempted to kill Gilmore that same day. (A. 9). D'Arco and his driver, Peter Delchioppo, found Gilmore sitting in the driver's seat of his limousine. (A. 10). D'Arco parked around the corner, and sent Delchioppo to go kill Gilmore. (A. 10). Delchioppo walked off toward Gilmore's car, but returned without making an attempt on Gilmore's life. Delchioppo explained that Gilmore had left the limousine and was sitting in the back seat of a car with two men who appeared to be police officers. (A. 11).

### 1.    Daidone's Efforts to Kill Gilmore

When D'Arco reported back to Amuso regarding the aborted attempt to kill Gilmore, Amuso instructed D'Arco to use Louis Daidone to carry out the murder. (A. 12). At that time, Daidone was a Soldier in D'Arco's crew. D'Arco went to see Daidone, and related Amuso's instructions to kill Gilmore. Daidone accepted the murder contract without objection; as D'Arco explained, Daidone himself would have been killed if he had refused. (A. 12-13).

Approximately one week later, Daidone reported back to D'Arco regarding his efforts to kill Gilmore. (A. 13). Daidone apologized because it had not yet been done, and explained that he had tried to kill Gilmore by hiding in the back of Gilmore's

limousine, but that Gilmore had re- turned to the car with a woman, so Daidone merely rode around with Gilmore until he could get out without being seen. (A. 13).

During this time, Joseph Defede (later to become Acting Boss of the Luchese Family) was an associate with Boss Vic Amuso. In December 1988, Defede learned from Amuso that Amuso believed that Gilmore was "trying to set him up," in that he was "asking certain questions that he shouldn't be asking." (Tr. 957). Amuso told Defede that Gilmore had been seen sitting in a car with two men who appeared to be law enforcement. (Tr. 958). In January 1989, Amuso complained to Defede that "nothing was done with Red Gilmore," and asked rhetorically, "What are they waiting for? Me to go wind up in the can?" (Tr. 958).

Shortly after those conversations with Amuso, Defede saw Gilmore at the Liberty Lounge. (Tr. 959). As Defede went into the bar, he "took a quick glance across the street. I [saw] three gentlemen standing across the street. One, Patty Dellorusso; one, Louie Daidone; and I didn't recognize the other individual." (Tr. 960). The same three men were still standing there when Defede left a short while later. (Tr. 960). The next day, Amuso commented to Defede that Defede had been at the Liberty Lounge later than usual the night before. (Tr. 963). Not long after his birthday on February 1, Defede read in the newspaper that Gilmore had been shot and killed. (Tr. 964-65).

### 2.    The Discovery of Gilmore's Body and the Autopsy

On February 6, 1989, New York City Police Department ("NYPD") Officer Kenneth Riker responded to 84-33 102nd Road in Queens in response to a radio call.

(Tr. 48). When he arrived, he saw the body of a deceased male, lying by the side of the house, with a gunshot to his head. (Tr. 49). The body was found on the steps by the side of the house, lying face up with his feet on the steps and a house key next to his hand. (GX 304-06).

The body was identified as that of Thomas Gilmore. An autopsy performed on Gilmore's body by the Office of the Chief Medical Examiner of the City of New York revealed three gunshot wounds to his head. (Tr. 516; GX 308). One bullet entered at the back of his neck and went into the right side of his brain; the second hit Gilmore on the lower right side of his neck, traveled across the neck, cutting the major arteries to the head, and lodged in the left shoulder; and the third entered from the left side of the neck and went into Gilmore's right lung. (Tr. 517-18). Any one of the three wounds was sufficient to kill Gilmore. (Tr. 520). All three bullets were recovered; two were fully jacketed medium-caliber bullets, while one was a nonjacketed bullet. (Tr. 520).

### 3.    Daidone's Report to D'Arco

About one week after reporting the failed attempt, Daidone told D'Arco that Gilmore had been killed. (A. 14). Daidone explained that he had taken Michael Devito and Patrick Dellorusso with him to Gilmore's house. When Gilmore came home, he walked around toward the back of the house, between the houses on that block, toward a rear entrance. Devito and Dellorusso ran up on Gilmore and shot him to death. (A. 14). Daidone was concerned that a woman on the second floor of the neighboring house had seen him, but D'Arco reassured him that, even if she did see

something, she would likely be too frightened to come forward. (A. 14). D'Arco reported back to Amuso that Gilmore had been killed.

## B.    The Murder of Bruno Facciolo

Bruno Facciolo was a Luchese Solider in Alfonso D'Arco's crew whose criminal activity of choice was fencing stolen gold and jewelry. (A. 16-17). In 1990, Facciolo had been having health problems, and underwent surgery for stomach cancer. (A. 17).

### 1.    Luchese Suspicions Regarding Facciolo and Decision to Kill Him

In late 1989, D'Arco had participated in planning the murder of Anthony DiLapi, a Luchese Solider whom Amuso had ordered killed. (A. 17-19). In 1990, Luchese Underboss Anthony Casso told D'Arco that D'Arco's name had come up in connection with an investigation by authorities in California into DiLapi's murder. (A. 18). Specifically, Casso said that the name "Little Al" had come up, and asked D'Arco who, if anyone, called him by that nickname. (A. 18). D'Arco replied that Facciolo did. (A. 18). Soon thereafter, D'Arco, Daidone, and other Luchese members were at a meeting when they were told that agents were surveilling their club, so everyone left. D'Arco went from the club to the Seaview Diner, where he saw Facciolo inside. (A. 19). D'Arco was advised that there were police officers also inside the diner, raising further suspicion about Facciolo. (A. 19).

Some time later, Casso told D'Arco that a source Casso had in California law enforcement had advised that Bruno Facciolo was cooperating with their investigation. In the summer of 1990, Casso passed on the instruction to D'Arco that

Facciolo was to be murdered. (A. 20). Casso further instructed that Louis Daidone, who had by now been elevated to Capo, and Frank Lastorino, another Luchese Capo, were to carry out the hit. (A. 20, 23). Casso also told D'Arco to tell Daidone to get a canary, put it into Facciolo's mouth, and let the body be found. (A. 23).

### 2.    Daidone's Plan and Facciolo's Murder

As instructed, D'Arco went to see Daidone. (A. 24). D'Arco told Daidone that Facciolo was a "stool pigeon," and that he was to work with Lastorino to carry out the murder. (A. 24). Daidone agreed to kill Facciolo, but said that he did not trust Lastorino and did not want to work with him. D'Arco told Daidone that those were his instructions. D'Arco also told Daidone to get a canary, put it in Facciolo's mouth, and let the body be discovered. (A. 24). D'Arco advised Daidone that Facciolo was "very cagey," and so he should be careful in how he attempted to carry out the murder. (A. 25).

Daidone soon reported back to D'Arco that he had come up with a plan. Daidone would ask Facciolo to formally introduce Daidone to another mafia member whom Facciolo knew but Daidone did not. (A. 25). D'Arco repeated his warning about Facciolo's cleverness, telling Daidone that "you better watch Bruno because if he catches on, you could have problems." (A. 25). Daidone also told D'Arco that he had obtained a canary, killed it, and placed it in his freezer. (Tr. 248). D'Arco admonished Daidone for leaving the bird where his wife might find it. (Tr. 248).

Approximately two weeks, later, Daidone reported back to D'Arco that Facciolo had been murdered. (A. 27). Daidone said that, as planned, they had picked up

Facciolo on the pretense of having Facciolo make an introduction for Daidone. Driving Facciolo's car, they took him to a local garage and parked outside. When they started to go inside, Facciolo was walking behind Daidone, and Facciolo saw Lastorino and Richard Pagliarulo, another Luchese Soldier, inside. (A. 27). Facciolo immediately started to run away, obviously suspecting a trap. Daidone ran after Facciolo, tackled him in the street, and dragged him back inside the garage. (A. 27).

Inside the garage, Daidone held Facciolo down on the floor. Facciolo begged Daidone to let him go home just one last time to see his daughter. (A. 27). In response, Lastorino began stabbing Facciolo while Daidone was holding him. Facciolo was screaming about the pain, and asked his attackers to shoot him in the head. (A. 28). Pagliarulo obliged, stepping up and firing gunshots into Facciolo's head, killing him. (A. 28).

Daidone told D'Arco that, as instructed, they placed a canary in Facciolo's mouth, put Facciolo's body in the trunk of Facciolo's car, and got rid of the car "somewhere in Brooklyn." (A. 28; Tr. 161).

On August 30, 1990, police in Brooklyn received a report of a foul odor coming from a parked car. (Tr. 33). When NYPD Officer Steven Zimmerman responded, he immediately noticed the "very foul odor" of a rotting corpse, and saw fluid dripping out of the trunk. (Tr. 33; GX 401, 402). Crime scene unit officers opened the trunk, and found a decaying body. (Tr. 34; GX 403, 404). The body was removed from the trunk, and placed on the ground on a plastic sheet. (Tr. 38; GX 405). Officer

Zimmerman saw "an object" in the body's mouth, but could not make out what it was. (Tr. 38, 41).

The body was ultimately identified as being that of Bruno Facciolo. The Office of the Chief Medical Examiner performed an autopsy on Facciolo's body, although the body was badly decomposed by the time it was found. (Tr. 523; GX 407). In his mouth was "an unrecognizable gray-green fibrous material" that, although it could not be identified, was "consistent with having come from an organic source." (Tr. 525). Facciolo had four stab wounds in his back, all within a small area, and the nature of each wound was similar, meaning that "there wasn't a lot of time of [sic] movement between when the first, second, third and fourth stab wounds were inflicted." (Tr. 527). The wounds were consistent with having been made by the same person and the same knife. (Tr. 527).

Facciolo also had four gunshot wounds to his chest, in a small area, and each traveling slightly downward, which were consistent with the shooter having been standing over Facciolo. (Tr. 529). Finally, Facciolo had three gunshot wounds to his head, one in his forehead, and one in each eye. (Tr. 531). Any one of the seven gunshots was sufficient to kill Facciolo. (Tr. 529, 531).

After Facciolo's body was found, Daidone reported to D'Arco that Facciolo's brothers had walked up to him on the street, and, when one of them pulled his hand

from behind his back, Daidone dove sideways, assuming that he had a gun and was coming to kill Daidone in revenge for Facciolo's murder. (Tr. 162-63).

### 3.    Daidone's Subsequent Admissions

In the late fall or early winter of 1991, Frank Gioia, at that time a Luchese Soldier, ran into Louis Daidone at a club in Brooklyn called Turquoise. (Tr. 556). Daidone bought a round of drinks, and began talking with Gioia. (Tr. 557). The primary subject of discussion was Alfonso D'Arco, who had recently agreed to cooperate with the authorities. (Tr. 557). Daidone said that he was worried about D'Arco having become a cooperating witness, and that D'Arco could "hurt" Daidone, i.e., his assistance could result in Daidone being indicted. (Tr. 557). Specifically, Daidone said "Frank, my days are numbered, our crews are going to get hurt the worst." (Tr. 557). Daidone explained that he was "worried about the stickup" and "worried about the body." (Tr. 558).

Daidone made clear that "the body" to which he was referring was Bruno Facciolo. Daidone said "luckily I played football." (Tr. 558). When Gioia asked what he meant, Daidone said "whacking Bruno, he tried to get away, I tackled him, I was able to drag him back there so they could finish him off, that's what I am worried about." (Tr. 558). He explained that he had held Facciolo down as he was shot and killed by Pagliarulo. (Tr. 558). Daidone said "Al knows all this," and so "my days are numbered." (Tr. 558).

On a different occasion, Gioia and Daidone again discussed D'Arco's cooperation. At Diamond's, a strip club where Pagliarulo was holding a Christmas

party, Daidone repeated that he was worried about getting indicted as a result of D'Arco's cooperation, and specifically that he expected to be arrested and charged with killing Facciolo. (Tr. 560).[2]

## C.    Daidone's Sentencing

After Daidone's post-trial motions for a judgment of acquittal and for a new trial were denied, Daidone was sentenced to concurrent terms of life imprisonment on Counts One, Two, and Three, with concurrent terms of 20 years' imprisonment on Counts Four and Five. (A. 123).

## D.    Daidone's Direct Appeal

On appeal, Daidone attacked his conviction on several fronts. Daidone argued that his prosecution on the witness tampering charge — which carried a mandatory life sentence upon conviction — was barred by the statute of limitations, and was faulty because of a failure to charge the jury on the definition of premeditation and because venue in the Southern District of New York was lacking. He attacked his racketeering convictions on the grounds that the Government had failed to establish a pattern of racketeering, and alleged that he was unfairly prejudiced by the introduction of evidence of uncharged criminal acts. Daidone challenged his sentence

---

[2] Daidone was also involved in substantial loansharking activities, which resulted in his convictions on Counts Four and Five. The Government could readily provide more detail on Daidone's loansharking activities if it would assist the Court in resolving Daidone's motion.

as unconstitutional, and sought reversal of his loansharking convictions on the grounds of spillover prejudice.

The Second Circuit affirmed Daidone's convictions and sentence in a published opinion. *See United States v. Daidone*, 471 F.3d 371 (2d Cir. 2006). The opinion noted that "Daidone raised several issues on appeal," *id*. at 373, and discussed at length his attack on the sufficiency of the "pattern of racketeering activity" required for conviction on Counts One and Two. *See id*. at 374-76. This Court rejected Daidone's venue challenge to Count Three as having been waived, and found that the mandatory life sentence required by Count Three mooted any need for resentencing under the now- advisory Sentencing Guidelines. *See id.* at 376-77. Finally, the panel stated that "[a]fter careful consideration of Daidone's other arguments, we conclude that each of these claims is without merit and does not require discussion." *Id.* at 377.

## E.   Daidone's E.D.N.Y. Conviction

As Daidone acknowledges in a footnote to his current motion, in April 2007 the United States District Court for the Eastern District of New York sentenced Daidone to a term of 57 months' incarceration after his guilty plea to loansharking charges, to be served consecutively to his life sentence in this case.

## F.   Daidone's Section 2255 Motion

On March 14, 2008, Daidone filed a motion seeking to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. (A. 128-45). Daidone alleged constitutionally ineffective assistance of both trial and appellate counsel for Lombardino's consent to (and Mitchell's failure to attack on appeal) the admission of

a single Government exhibit at trial, a 2002 letter written by the Government seeking a reduced sentence for cooperating witness Alfonso D'Arco (hereinafter "D'Arco 5K1.1 Letter" or the "Letter"). Daidone contended that certain statements made in the Letter improperly vouched for D'Arco's credibility and thereby prejudiced him.

This Court denied Daidone's motion, and the Second Circuit affirmed that denial. *See Daidone v. United States*, 2009 WL 2611943 (S.D.N.Y. Aug. 24, 2009), *aff'd*, 422 F. App'x 26 (2d Cir. 2011).

## G.    Daidone's Motion for Immediate Release

Daidone now asks this Court to release him immediately. Daidone argues that his conviction on Count Three has been undermined by subsequent legal developments, so he would not face a mandatory life sentence because Counts One and Two have a life maximum but no mandatory sentence, and that as a result this Court would have had the discretion to impose a lesser sentence under the now-advisory guidelines. Daidone argues that this represents "extraordinary and compelling circumstances" under 18 U.S.C. § 3582(c).

## III. Applicable Law

Under 18 U.S.C. § 3582(c), as amended by the First Step Act, a district court "may not" modify a term of imprisonment once imposed, except under limited circumstances. One such circumstance is the so-called compassionate release

provision, which provides that a district court "may reduce the term of imprisonment" where it finds "extraordinary and compelling circumstances." *Id.* § 3582(c)(1)(A)(i).[3]

To satisfy the requirements of sentence reduction pursuant to the compassionate release provision, the defendant must demonstrate "extraordinary and compelling reasons." The Second Circuit has held that the First Step Act of 2018 "allows [district] courts independently to determine what reasons, for purposes of compassionate release, are extraordinary and compelling" and that the BOP Director is no longer the sole arbiter in determining whether the threshold is met." *See United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020) ("Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion."). Courts may "look to § 1B1.13 for guidance in the exercise of their discretion, but are free to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." *United States v. Rodriguez*, 2020 WL 7640539, at *3 (S.D.N.Y. Dec. 23, 2020) (cleaned up).

Whether such "extraordinary and compelling reasons" exist, however, is only "[t]he threshold question." *United States v. Daugerdas*, 2020 WL 2097653, at *2 (S.D.N.Y. May 1, 2020). "[T]his Court's analysis does not end with a finding that

---

[3] Although the First Step Act does not expressly address release to home confinement, a district court may reduce the defendant's sentence to time served, release the defendant to supervised release, and order home confinement as a condition of supervised release, as long as that additional time on supervised release "does not exceed the unserved portion of the original term of imprisonment." 18 U.S.C. § 3582(c)(1)(A); *accord United States v. Park*, 456 F. Supp. 3d 557, 563 (S.D.N.Y. 2020).

'compelling and extraordinary reasons' warrant compassionate release. This Court must also 'consider[] the factors set forth in section 3553(a).'" *Id.* at *4.

Those § 3553(a) factors include, among others:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

> (B) to afford adequate deterrence to criminal conduct; [and]

> (C) to protect the public from further crimes of the defendant; [and]

* * *

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

18 U.S.C. § 3553(a).

## IV. Discussion

### A.   No Legal Developments Support Daidone's Motion

Contrary to Daidone's argument, court decisions over the intervening years have not changed anything relevant to Daidone's witness tampering conviction, and even if they had, that would not constitute extraordinary and compelling circumstances.

At Daidone's trial, FBI Special Agent Carl Burrell testified that, in 1990, he was involved in an investigation in New York that implicated Bruno Facciolo. (Tr.

804). The agents obtained evidence that Facciolo and others were involved in a significant fencing operation in the 47th Street jewelry district in Manhattan. (Tr. 805). Facciolo was ultimately indicted in the Southern District of New York and arrested in July 1990. (Tr. 807). After his arrest, Facciolo was approached about cooperating with the Government, but declined. (Tr. 809, 811-12).

Special Agent Burrell explained the procedure in the Southern District of New York for witnesses who wish to cooperate. The agents and the prosecutors will first debrief the witness, to determine if the witness has any helpful information. (Tr. 808). If so, the witness will be asked to sign a cooperation agreement. As part of that agreement, the witness is required to plead guilty to the crimes he has committed, including the ones with which he has already been charged. (Tr. 808).

The jury was properly instructed in connection with Count Three that it had to find "[f]irst, that on or about August 24, 1990, the defendant killed or caused another person to kill Bruno Facciolo. Second, that the defendant did so knowingly and with the intent to (A) prevent the attendance or testimony of Bruno Facciolo in an official proceeding or (B) prevent Bruno Facciolo from communicating to a law enforcement officer or judge of the United States information relating to the commission or possible commission of a federal offense." (Tr. 1398). The Second Circuit had held—before Daidone's trial—that the "government [must] prove that at least one of the law-enforcement-officer communications which the defendant sought to prevent would have been with a federal officer." *United States v. Diaz*, 176 F.3d 52, 91 (2d Cir. 1999). The Supreme Court later stated, consistent with this requirement,

in *Fowler v. United States*, 563 U.S. 668 (2011), that the Government satisfies this element "only if it is reasonably likely under the circumstances that (in the absence of the killing) at least one of the relevant communications would have been made to a federal officer." *Id.* at 678.

Consistent with Special Agent Burrell's testimony, the Government argued that, had Facciolo cooperated, that cooperation would have been rendered first and foremost with federal authorities in the Southern District of New York, where Facciolo's own criminal charges were pending at the time of his death. This testimony sufficed, under both the law in effect at Daidone's trial and that in place today, to establish that Facciolo would have necessarily communicated with Special Agents of the Federal Bureau of Investigation, which was responsible for his case. Further, even if Facciolo's initial approach had been elsewhere, because Facciolo's knowledge and information related to the New York-based Luchese Crime Family of La Cosa Nostra, a "juror could reasonably conclude that a racketeering enterprise of this interstate scope and on such a large scale was likely to be investigated and prosecuted by federal officials." *Dhinsa v. Krueger*, 917 F.3d 70, 83 (2d Cir. 2019).

But even assuming for purposes of argument that the law regarding witness tampering has evolved in Daidone's favor, and that the now-advisory guidelines would have enabled this Court to consider a lesser sentence, that would still not constitute "extraordinary and compelling circumstances" under 18 U.S.C. § 3582(c). *Cf. United States v. Jackson*, 541 F. App'x 119, 120 (2d Cir. 2013) (holding that Section 3582(c) is not "an available avenue" to seek a new sentence "using the

advisory Guidelines" (citing *Guzman v. United States*, 404 F.3d 139, 143-44 (2d Cir. 2005), which held that *United States v. Booker*, 543 U.S. 220 (2005), is not retroactively applicable to cases on collateral review)); *see generally, e.g., Speed v. United States*, No. 04 Cr. 336 (PKC), 2021 WL 1085360, at *4 (S.D.N.Y. Mar. 22, 2021) (explaining that "a nonretroactive intervening change in the law . . . does not mandate a finding of extraordinary and compelling reasons"); *Musa v. United States*, No. 19 Civ. 9130 (RJS), 2020 WL 6873506, at *7 (S.D.N.Y. Nov. 23, 2020) (finding that the "change in the law is not enough, standing alone, to automatically merit [the defendant's] release"); *United States v. Minaya*, 2020 WL 5512518, at *3 (S.D.N.Y. Sept. 14, 2020) (collecting cases); *United States v. Fuller*, 2020 WL 5849442, at *2 (S.D.N.Y. Oct. 1, 2020).

## B.  No Other Factors Rise to the Level of Extraordinary and Compelling Reasons

Daidone argues that this Court could rely on a variety of other factors to support a finding of extraordinary and compelling reasons supporting his release. He cites the length of his sentence, his age, his supposed service of a "substantial" portion of his life sentence, the age of his conduct and the supposedly mitigating factor that his victims were associated with the Luchese Family, and that his fellow murders served less time than he has. None of these arguments withstands scrutiny.

Daidone was sentenced to life in prison for racketeering involving murder, racketeering conspiracy involving murder, and witness tampering by murder. The jury found him directly responsible for two homicides. A life sentence for premeditated murder is the default recommendation under the Sentencing

Guidelines, and life sentences are routinely imposed for intentional murders such as those committed by Daidone. There is nothing extraordinary about Daidone's sentence.

Daidone's age—75 years old—places him among the eldest 3% of federal inmates, but he does not meet the criteria identified in the Sentencing Guidelines as warranting consideration for compassionate release. Under Section 1B1.13(1)(B), a defendant must be at least 70 years old and have served at least 30 years of his sentence to qualify. The Guidelines thus set the threshold for what constitutes a "substantial portion" of a sentence at 30 years, 12 years longer than Daidone has served. Alternatively, a defendant who is at least 65 years old, has served at least ten years, and is "experiencing a serious deterioration in physical or mental health because of the aging process" may be deemed to have shown extraordinary circumstances. U.S.S.G. § 1B1.13 comment. (n.1(B)). Daidone does not argue, and his medical records would not support, that his medical conditions reflect a "serious deterioration" in his physical health. Although this Court is not bound by these principles in assessing the presence of extraordinary circumstances, they weigh against such a finding.

Nothing about the age of his conduct or the character of his victims should be deemed to support a finding of extraordinary circumstances. Indeed, the many years between the Gilmore and Facciolo murders and Daidone's prosecution for committing them weigh against his argument for release. From June 1996 to March 2003, Daidone lived as a free man with his wife and children. Although as a grandfather he

has missed many milestones in his grandchildren's lives, he had many of those opportunities with respect to his wife and children while he remained unprosecuted for his crimes.

Nor does it matter that his murder victims were themselves associated with the Luchese Family. This Court should not entertain the argument that the lives of Thomas Gilmore and Bruno Facciolo matter less because of their criminal past. Indeed, this Court would rightly condemn an argument that Daidone himself is unworthy of consideration solely because he was the Acting Boss of the Luchese Family. In any event, Daidone killed not out of passion, like the case he cites, but out of loyalty to the Luchese Family.

Daidone's sentence was not disproportionate to anyone's. Although Lastorino helped kill Facciolo, he pled guilty and accepted responsibility for his crimes, unlike Daidone; in exchange for the certainty of a conviction, the Government agreed to a lesser sentence for him. Codefendants who plead guilty are not similarly situated to those who go to trial. *See, e.g., United States v. Flores*, 447 F.3d 145, 158 (2d Cir. 2006). And Pagliarulo was serving a life sentence, just like Daidone is now, when he died in prison. That Pagliarulo ended up serving a shorter sentence because he died does not make him similarly situated to Daidone.

As to Daidone's medical condition, Bureau of Prisons records indicate that, as of October 2021, his previous complaint of knee pain had "resolved" and he reported to be "doing well." Daidone was not having any issues with his medications, and his atrial fibrillation was "well-controlled" by his pacemaker, which had been checked in

July 2021. Daidone reported no other medical problems.[4] These conditions do not qualify as extraordinary and compelling reasons for release. Section 1B1.13, although not binding on this Court, provides useful guidance here. *See United States v. Borelli*, 2021 WL 2228075, at *3 (S.D.N.Y. June 2, 2021). Application Note 1(A)(ii)(I) to U.S.S.G. § 1B1.13 states that extraordinary and compelling reasons exist when the defendant is not a danger to the safety of any person or the community and is suffering from a serious physical or medical condition that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover. *See United States v. Hope*, 464 F. Supp. 3d 646, 650 (S.D.N.Y. 2020). Daidone cannot make this showing. His health records show that he is receiving treatment for his conditions, and he does not argue he cannot care for himself. Accordingly, Daidone's medical conditions do not constitute an extraordinary and compelling reason warranting a modification to his sentence. *See United States v. Marquez*, 2020 WL 4016840, at *2 (S.D.N.Y. July 16, 2020).

In the context of compassionate release motions involving murder, the defendant relies on cases granting release on the basis of rehabilitation and argues (at 27-29, 64-67) that rehabilitation is a reason to reduce his sentence. The Government does not dispute that the defendant has put forward evidence of

---

[4] The Government obtained Daidone's medical records from the Bureau of Prisons after learning of this motion, and has provided them to defense counsel. To preserve Daidone's privacy, the Government will not attach them to this opposition (although it has no objection to defense counsel filing them should he deem it appropriate). If the Court wishes to review any of the records in the Government's possession, the Government will forward them under seal.

rehabilitation, and that he remains devoted to his family. But rehabilitation alone cannot be the sole basis for compassionate release. *See Brooker*, 976 F.3d at 238. And the evidence of rehabilitation put forward by the defendant is not comparable to that provided in other cases where defendants displayed "overwhelming evidence" of "total rehabilitation." *United States v. Rodriguez*, 492 F. Supp. 3d 306, 311-13 (S.D.N.Y. 2020) (taking particular note of an "extraordinary collection of letters" from, among others, 27 members of the prison staff, which the court referred to as "nothing short of remarkable"); *accord United States v. Quinones*, 2021 WL 797835, at *2-3 (S.D.N.Y. Feb. 27, 2021); *United States v. Underwood*, 2021 WL 3204834 (S.D.N.Y. Jan. 15, 2021); *United States v. Torres*, 464 F. Supp. 3d 651, 660-65 (S.D.N.Y. 2020).

## C.    The Section 3553(a) Factors Weigh Against A Sentence Reduction

Even if Daidone had established an extraordinary and compelling reason warranting compassionate release, a reduction in sentence is available only for defendants who meet that preliminary threshold and for whom a reduction is appropriate based on the sentencing factors set forth in 18 U.S.C. § 3553(a). In Daidone's case, a reduction in sentence would not be appropriate.

Louis Daidone was a high-ranking member of the Luchese Crime Family, rising as high as Acting Boss. He conducted and participated in the conduct of the affairs of the Luchese Family by, among other things, murder and loansharking. Both of his murder victims were killed because of suspicion that they were cooperating with, or were about to cooperate with, law enforcement, making those killings particularly heinous. Daidone's sentence reflected the gravity of his conduct, provided

just punishment for the offense, and was necessary for both specific and general deterrence and to promote respect for the law. These same factors counsel against a sentence reduction for him. Compassionate release would not be in the interests of justice.

Dated: December 3, 2021

>                             Respectfully submitted,
>
>                             DAMIAN WILLIAMS
>                             United States Attorney
>                             Southern District of New York
>
>                     By:     /s
>                             KARL METZNER
>                             Assistant United States Attorney

cc:     Defense Counsel