**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

               -against-

LOUIS DAIDONE,

                      Defendant.

02-CR-1584 (RMB)

**ORDER**

The Government is respectfully requested to respond to Defendant's motion on or before May 23, 2025.

Date: April 29, 2025
New York, New York

**RICHARD M. BERMAN, U.S.D.J.**

April 13, 2025

Louis Daidone
#39065-053
USP Coleman 1
USP COLEMAN I
U.S. PENITENTIARY
P.O. BOX 1033
COLEMAN, FL   33521


United States District Court
Honorable Judge Richard Berman
500 Pearl Street
Courtroom 17 B
New York, NY 10007-1312

Dear Judge Berman,

Finding a place to begin this letter seems to be the most difficult. But I think the best place to begin is by saying I understand that you are not a person that is easily fooled. I know that you have been on the bench for a while now and there have been many people that have come before you that are seeking mercy and sometimes simply grace. I too come before you Judge seeking the same. I am prayerful that you will see the change in me and my character.

There is no doubt that I deserved to go to prison, and I must admit that I deserved a very significant sentence for the irrational and irresponsible choices that I made in life. Today I can tell you with honesty I regret every single one of them. Not simply because I am in prison and have been for over 22 years but because of the decisions, I made hurt so many people. I want to publicly apologize to the people that I have harmed, the family members and my community. I was part of the problem and not part of the solution. Today, Judge Berman, I can tell you that I am deeply sorry for that. There are not enough words in the world to truly reflect the depths of my regret and remorse. I am committed to never again making choices that can hurt others, my community, my family, or myself.

I know that granting compassionate release is never an easy choice. Over the years that I have been here I have seen many people that I have been incarcerated with

1

get that second chance and do great things with it. My hope is to be able to prove to you that I am worthy of a second chance as well. Failure is not an option for me in any way, shape or form. All I have to offer is my word to you that if given a second chance I will not let you down. I will not disrespect the US Attorney's office by committing any more crimes, or the other people behind me that are also seeking a second chance, nor my family or the people who have believed in and supported me over all these years.

If this case is just about punishment, then I deserve everything that was given but if it is also about change and self-betterment I want you to know that I have made those changes. I am now 79 years old and have spent many years of my life in federal prison. Things have not been easy for me the last few years with my health and being able to take care of myself. My hope is to have a chance to spend whatever little time I have left with my wife, daughter, grandchildren, and family.

Today, Judge Berman, instead of mercy I am asking you for grace. Sometimes people are simply given grace and today I ask for that in my request for a second chance to reclaim my life.

Respectfully,

Louis Daidone

## <u>CERTIFICATE OF SERVICE</u>

I, Louis Daidone, hereby certify that on this __ day of April 2025, I did place

the enclosed Motion Requesting a Reduction in Sentence Pursuant to 18 U.S.C. §

3582, in the prison mailing system addressed to the following parties:

United States District Court
Court Clerk
500 Pearl St.
Courtroom 17 B
New York, NY 10007-1312

United States Attorney's Office
One St. Andrews Place
New York, NY 10007

Signed under the penalty of perjury

this _____ day of April 2025.

_____
Louis Daidone

## IN THE UNITED STATES DISTRICT COURT
## FOR THE
## SOUTHERN DISTRIT OF NEW YORK

**LOUIS DAIDONE**

Petitioner,

vs.                              Case No: 02-CR-1584 (SDNY) (RMB)


**UNITED STATES OF AMERICA**

Respondent.


## MOTION FOR REDUCTION IN SENTENCE PURSAUNT TO
## 18 U.S.C. § 3582


## <u>INTRODUCTION</u>

## <u>SHOULD LOUIS DAIDONE DIE IN PRISON?</u>

Mr. Daidone has been in prison for over 22 years for actions that he deeply regrets not because he is in prison but because he knows those irrational and irresponsible decisions hurt others. Many Courts across the country including in this district and the Eastern District of New York have recently granted compassionate release to those convicted of similar crimes to Mr. Daidone. Today

1

at the age of 79 years old Mr. Daidone is asking this Court to grant him an opportunity to spend his last days with his family.

People grow, mature and evolve, and because conditions and circumstances change, it is virtually impossible to make sound decisions when first imposing a sentence about precisely how long someone should spend behind bars. But that is exactly how the federal criminal justice system works. Judges are required to act as if they are omniscient and the prison terms they impose are – for all intents and purposes – final.

And, until the recently enacted First Step Act, virtually no means existed for taking a "second look" at them, even decades later when continued confinement (for many offenders) can no longer reasonably be justified on moral or utilitarian grounds.

Congress did, when it abolished parole through passage of the Comprehensive Crime Control Act of 1984, vest the U.S. Bureau of Prisons (the "BOP") with the authority to review the sentences imposed on a few narrow categories of defendants. But the BOP largely failed to exercise that discretion. Responding to concerns that the BOP was not making adequate use of its legal authority (and for other unrelated reasons), lawmakers passed, and in December 2018 Donald J. Trump signed into law, the bipartisan First Step Act, a sweeping criminal justice reform bill intended to promote rehabilitation, reduce recidivism

and cut excessive sentences. Thus, today, federal judges are authorized and empowered to take a "second look" at the sentences imposed on offenders who present "extraordinary and compelling reasons" for sentence reductions and to reduce the sentences – even to time-served – of those offenders for whom the 18 U.S.C. § 3553(a) sentencing factors support a sentence reduction.

Louis Daidone, age 79, is precisely the type of individual for whom the First Step Act was intended. He has served almost 23 years of his life sentence, amounting to roughly 28 years imprisonment once "good conduct time" is accounted for. He suffers from innumerable serious and debilitating medical conditions that hamper his ability to care for himself in federal prison and that will only further deteriorate as he continues to age. He has rehabilitated himself to the fullest extent possible (even though he did not stand to gain anything other than personal improvement from doing so). And he has a close-knit group of family and friends who are committed to supporting him if he is released from prison. Also, today, as mentioned above, Mr. Daidone makes no excuses for his decidedly serious criminal conduct. He does not seek to justify, diminish or detract from the gravity of his offenses. Rather, he unequivocally accepts responsibility for his criminal conduct. Mr. Daidone is also deeply remorseful for the crimes that he committed and the people who those crimes hurt and affected.

3

Mr. Daidone now moves this court pro-se for an order granting a reduction of sentence as he respectfully submits that "extraordinary and compelling reasons," exist for a reduction of Mr. Daidone's sentence.

## FACTS

Mr. Daidone was arrested and charged with various offenses. He would eventually be sentenced to life. Mr. Daidone is 79 years old and currently is scheduled to die in prison, absent this Court's compassion. The sentence in this case was motived from a judgment convicting Daidone on a five-count indictment – that generated three life and two 20-year terms, all running concurrently.

## ARGUMENT

Mr. Daidone's total sentence of life imprisonment is and was extraordinary. If sentenced today it is possible that the life sentence would not be imposed as outlined below. He has been in prison for over 22 years for crimes at issue here.

There is no excuse for his actions, however, he submits that the current sentence is longer than necessary in this case to achieve the objectives that a sentence be sufficient but not greater than necessary, to achieve the goals of sentencing as spelled out in 18 U.S.C. § 3582. Mr. Daidone does not dispute the criminal conduct for which he was convicted at trial. Rather, he recognizes, understands and accepts full responsibility for, and is remorseful for, the crimes

4

he committed. Indeed, Mr. Daidone knows that he engaged in serious criminal conduct that constituted serious violations of the law deserving of condemnation and punishment. Still, today, almost 23 years after his arrest and detention, and after doing all he possibly could to rehabilitate and reform himself, Mr. Daidone is, particularly given his serious medical conditions, worthy and deserving of a "second look" and a "second chance" in the form of a reduced sentence of time served. See United States v. Vigneau, 473 F. Supp. 3d 31, 39 (D.R.I. 2020) ("it is hard to reconcile Mr. Vigneau's thirty-year sentence with modern sentencing regimes and statistics, and especially with an ever-increasing body of research that questions the effectiveness of imprisoning convicted defendants for a period greater than reasonably necessary").

## I.    18 U.S.C. § 3582(c)(1)(A) EMPOWERS THIS COURT TO REDUCE MR. DAIDONE'S SENTENCE

Pursuant to the First Step Act's changes to 18 U.S.C. § 3582(c)(1)(A) district courts may now reduce a defendant's sentence upon the filing of a sentence reduction motion after the occurrence of the first of the following two events (commonly known as the "exhaustion" of "administrative remedies"): (1) a Warden's rejection of a request for a sentence reduction motion; or (2) the passage of thirty days without a response from a Warden to a request for a sentence reduction motion. Also, pursuant to Guidelines amendments that went

5

into effect on November 1, 2023, Application Note 1B1.13 to the Guidelines no

longer governs 18 U.S.C. § 3582(c)(1)(A), sentence reduction motions. See

https://www.ussc.gov/sites/ default/files/pdf/amendment-process/reader-friendly-

amendments/20230405_prelim-RF.pdf (last visited March 13, 2025).

Rather, today, no limits exist as to the "extraordinary and compelling

reasons" upon which a sentence reduction motion may be based or granted. See

United States v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020) ("the First Step Act

freed district courts to consider the full slate of extraordinary and compelling

reasons that an imprisoned person might bring before them in motions for

compassionate release").

This Court therefore has broad discretion to determine whether

"extraordinary and compelling reasons" exist such that a reduction of Mr.

Daidone's life sentence is warranted. See United States v. Anderson, Case No. 18-

CR-71 (RJA), 2021 WL 776975, at *2 (W.D.N.Y. Mar. 1, 2021) ("[d]istrict courts

have broad discretion in deciding whether to grant or deny a motion for a sentence

reduction"); United States v. Johnson, Case No. 93-CR-631 (PGG), 2021 WL

640054, at *3 (S.D.N.Y. Feb. 18, 2021) ("the district court has broad discretion in

evaluating a defendant's motion for compassionate release . . . and may consider

the full slate of extraordinary and compelling reasons that an imprisoned person

might bring before them") (internal citations and quotation marks omitted).

6

Thus, after exhausting his/her BOP administrative remedies, "a court may reduce a [defendant's] term of imprisonment" pursuant to 18 U.S.C. § 3582(c)(1)(A) "if it: (1) finds that extraordinary and compelling reasons warrant a reduction; (2) finds that the defendant will not pose a danger to the safety of any other person in the community; and (3) considers the sentencing factors outlined in 18 U.S.C. § 3553(a)." United States v. Khawaja, Case No. 18-CR-127 (LM), 2020 WL 5549123, at *2 (D.N.H. Sept. 16, 2020).

## II.    MR. DAIDONE HAS EXHAUSTED HIS PREREQUISITE BOP ADMINISTRATIVE REMEDIES.

On March 17, 2025, Mr. Daidone submitted a request for a sentence reduction motion to the Warden of USP Coleman 1, the maximum-security BOP facility at which he was detained at the time. (Exhibit A.) He asserted that he should be granted a sentence reduction because of his poor health and his inability to care for himself within the prison environment, the unanticipated and unexpectedly harsh conditions of confinement during the COVID-19 pandemic, changes in law that may have effected the sentencing package in the case at bar, the sentencing disparity between himself and his codefendants, and Mr. Daidone's exceptional rehabilitation. (Id.) 30 days have now passed, and the Warden has not moved the Court for a reduction on Mr. Daidone's behalf. Mr. Daidone therefore has

7

exhausted his pre-requisite administrative remedies and is now statutorily authorized to present this Court with the instant 18 U.S.C. § 3582(c)(1)(A) sentence reduction motion.

### III.   THE "EXTRAORDINARY AND COMPELLING REASONS" THAT WARRANT A REDUCTION OF MR. DAIDONE'S LIFE SENTENCE TO TIME-SERVED

Considered collectively, the following factors constitute "extraordinary and compelling reasons" for a reduction of Mr. Daidone's life sentence to time-served. See United States v. Trenkler, 47 F.4th 42, 49 (1st Cir. 2022) ("the whole may be greater than the sum of its parts, and reasons that might not do the trick on their own may combine to constitute circumstances that warrant a finding that the reasons proposed are, in the aggregate, extraordinary and compelling").

### A. Mr. Daidone's Poor Health and Deteriorating Health

Since this Courts denial of compassionate release Mr. Daidone's health has worsened and his ability to take care of himself within the prison environment has become increasingly difficult. Daidone at the age of 79 years old suffers from numerous serious and debilitating medical conditions that, considered collectively, constitute "serious physical or medical condition[s]" arising from "the aging process" that "substantially diminish" his "ability . . . to provide self-care within the environment of a correctional facility and from which [he] is not expected to

recover" – that is, he is "experiencing a serious deterioration of physical or mental health because of the aging process." U.S.S.G. § 1B1.13.

Mr. Daidone had open heart surgery in which a pacemaker was implanted and he is currently still in A-Fib. Mr. Daidone lives with constant chest pain. See Exhibit B. Daidone also had a knee surgery replacement at the Springfield facility. That surgery was unsuccessful as the FBOP failed in assisting Mr. Daidone in getting the straightening and bending back to normal post-surgery. This has resulted in Mr. Daidone falling down resulting in the need for him to now use a walker. The pain in the knee has prevented him from making it to the mess hall for meals, and other appointments as he sometimes cannot walk even with the walker. Mr. Daidone now also cannot use his hands much to write or do other tasks as he has uncontrollable shaking in his hands. There is also an issue with a possible hernia as of recent that the BOP says they are going to look at. However, at the time of this writing that has not been done. There have also been issues with severe sciatica that's also required hospitalization and morphine injections. Since this Courts prior decision Mr. Daidone's conditions have worsened, and he now spends most of his days lying in bed. There are days when he is unable to bathe himself, or as mentioned above make it to the mess hall to eat thus, leaving him for days without eating. It should also be noted that Mr. Daidone was brought back to the prison the day after his surgery. He was given no pain medication, could not walk

9

to the mess hall, and no food was brought to him while at the Springfield facility. Daidone lost over 30 pounds during that time.

Mr. Daidone can no longer take care of himself within the prison environment. Records obtained from the Bureau of Prisons (BOP) show at least 4,950 people died in its custody over roughly the past decade. Although there are more than 120 federal prisons nationwide, a quarter of those deaths occurred in a single place: the Butner Federal Correctional Complex in Butner, North Carolina. https://www.npr.org/2023/09/23/1200626103/federal-prison-deaths-butner-medical-center-sick-inmates

While Daidone is not housed at the Butner prison this demonstrates the care that is being given within the Federal Prison system. (While he is not housed there it is possible that he may very well end up there as he is awaiting the transfer). It also gives insight into what is transpiring within the FBOP with elderly and sick prisoners. The Bureau of Prisons claims to meet the same medical standards as any independent hospital, stating on its website that it is accredited by the nation's leading accreditation agency. But NPR found that, in fact, the BOP's certification lapsed over two years ago. https://www.npr.org/2023/09/23/1200626103/federal-prison-deaths-butner-medical-center-sick-inmates

In this NPR investigation the data was gathered and analyzed from the Federal Government. In addition to gathering and analyzing data from the federal government, NPR reviewed court and medical records and interviewed inmates, lawyers, families and bureau employees while looking into the stories of patients in federal prisons.

- Angela Beck, a 47-year-old at the time with a family history of breast cancer, discovered lumps in her left breast while in federal prison in Aliceville, Ala., and asked to see a doctor. After receiving imaging results "'highly suggestive' of cancer," according to an opinion issued by a federal judge, she waited more than eight months for a biopsy, which confirmed the cancer. Another two months passed before she got surgery, during which doctors confirmed the disease had spread to her lymph nodes. Beck then waited another five months before she saw an oncologist. By that time, it was too late to start chemotherapy or radiation. A federal judge granted her release in June 2019.

- Michael Derentz, a 70-year-old inmate at the Fort Dix federal prison in New Jersey, was granted compassionate release in 2022 after a federal judge found the BOP's repeated delays in care "disturbing." "Delays in securing urgently needed follow-up appointments contributed to Derentz becoming blind in his left eye," the judge wrote.

- Joseph Guadagnoli died of cancer while in custody at the federal prison in McDowell County, W.Va., in July 2022, after complaining of a litany of ailments. By the time doctors diagnosed his cancer in May of that year, it was too late for treatment, his brother Michael Guadagnoli said. On Sept. 7, 2020, records show, Joseph wrote a sick call request to staff: "My conditions are getting worse. I need to be seen soon." On Oct. 10: "This is taking a psychological toll on me — what do I have to do to be seen — to get attention?" On Dec. 1: "I cannot breathe. ... I have been asking for seven months."

- In April 2020, Turhan Law began having nosebleeds several times a day at the federal prison in Loretto, Pennsylvania. According to a compassionate release motion filed by his lawyer, that bleeding continued for months before prison officials took him to a hospital. In the summer of 2020, a

biopsy confirmed squamous cell carcinoma, a type of cancer. But by the time Law arrived at Butner in November of that year, no treatment plan had been started, according to a supplemental motion filed in support of Law's release request. In December 2020, a month after the BOP sent Law to Butner, a federal judge granted his request for release, citing in part the delays in care Law experienced.

- Michael Boughner, a federal prisoner at the U.S. penitentiary in Florence, Colo., complained of horrible headaches for at least five weeks before he saw a doctor, his mother, Linda Renta, said. "He fainted four or five times, and the guards were convinced he was faking it," Renta said. "They found that he had a tumor in his brain the size of an egg." The BOP sent Boughner to Butner, where he lived for about five months before, prison records show, he died of cancer at age 50 in March 2019.

It is well known in the legal community (and several courts have even acknowledged) that the medical care provided by the BOP is less than optimal. See, e.g., C.J. Ciarmella, Judge Holds Federal Bureau of Prisons in Contempt for Allowing Man to Waste Away from Untreated Cancer, REASON (Nov. 10, 2022) (found at https://reason.com/2022/10/10/judge-holds-federal-bureau-of-prisons-in-contempt-forallowing-man-to-waste-away-from-untreated-cancer/) (last visited Apr. 10, 2024) (reporting on the Honorable Roy Dalton of the United States District Court for the Middle District of Florida castigating the BOP for providing inferior medical care and Judge Dalton having written that the BOP should be "deeply ashamed" of the medical care it provided to a dying inmate).

The starting point in determining what constitutes "extraordinary and compelling reasons" under § 3582(c)(1)(A)(i) is the Sentencing Guideline discussing compassionate release issued by the United States Sentencing

Commission. See U.S.S.G. § 1B1.13; see also United States v. Rivernider, No. CR10-222, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019). The Guideline provides that extraordinary and compelling reasons exist for the defendant's medical condition due to:

(i) The defendant is suffering from a terminal (i.e., a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is

(I) **suffering from a serious physical or medical condition**,

(II) suffering from serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which [the defendant] is not expected to recover. U.S.S.G. § 1B1.13 cmt. n.1(C).

The medical and physical conditions from which Mr. Daidone suffers are progressive, meaning they will only worsen as he continues to age. Indeed, he is not expected to recover (or even improve) from many of those conditions. Rather, Mr. Daidone's medical and physical conditions will continue to deteriorate as they inevitably advance as he continues to age. Simply put, Mr. Daidone's "body and mind [are] besieged with mounting, serious afflictions." United States v. Hansen, Case No. 07-CR-52 (KAM), 2020 WL 1703672, at *8 (E.D.N.Y. Apr. 8, 2020). Simply put, "it is evident" that Mr. Daidone "is experiencing a serious deterioration in physical health as he ages." United States v. Esparza, Case No. 07-CR-294 (BLW), 2020 WL 1696084, at *2 (D. Id. Apr. 7, 2020) See also United States v. Salemo, Case No. 11-CR-65 (JSR), 2021 WL 4060354, at *4 (S.D.N.Y. Sept. 7, 2021) (finding "extraordinary and compelling reasons" for a sentence reduction for a 77-year-old defendant based on his "age and growing list of medical problems").

A reduction of Mr. Daidone's life sentence to time-served would reflect not only the reality of his medical and physical conditions today but also the inevitable deterioration of his health as he continues to age. See United States v. Samuel, Case No. 16-CR-0117 (ELH), 2023 WL 8650366, at *15 (D. Md. Dec. 14, 2023) (**reducing sentence of 56-year-old career offender** to 120 months imprisonment, in part, because he "suffers from an array of chronic, serious medical conditions")

After all, life in prison – with its stressors, violence and disease – can significantly shorten a defendant's life expectancy. See United States v. Taveras, 436 F. Supp. 3d 493, 500 (E.D.N.Y. 2006) (life expectancy within federal prison is considerably shortened). Mr. Daidone is 79 years old and currently housed in one of the federal prison's most dangerous prisons in the country that has been plagued with extreme violence resulting in prolonged lockdowns which also affect's one's mental health.

### IV.     The Length of Mr. Daidone's Sentence

To date, Mr. Daidone has served almost 23 years of his life sentence, longer than any of his co-defendants served. We therefore submit that the length of Mr. Daidone's sentence and the almost 23 years he has already served support the conclusion that "extraordinary and compelling reasons" exist for a reduction of his life sentence to time-served. See, e.g., United States v. Maumau, 993 F.3d 821, 837 (10th Cir. 2021) (holding that the district court had discretion to grant an 18 U.S.C. § 3582(c)(1)(A) sentence reduction in part because of the "incredible length of" the defendant's sentence); Brooker, 976 F.3d at 237 (holding that a court should consider "all possible reasons for compassionate release," including the "injustice" of the length of an offender's sentence).

The Court in this case can also consider the sentencing disparities in this case and the facts as they apply to Mr. Daidone. While he does not discredit the

seriousness of the offense and the need for a harsh punishment Daidone asks that the Court consider the sentences and time that the accomplices served for the conduct in this case. The codefendants who actually killed Mr. Facciolo were implicated in the murder, charged and convicted. Frank Lastorino, 82, was released from prison in 2008 after serving part of an 18-year sentence imposed, upon a guilty plea, in Sept. 1994. Richard Pagliarulo died in prison in 1999, aged 50, after serving under four years of a life sentence imposed, upon a jury verdict, in Jun. 1995.

In United States v. Ferguson, No. 2:10-CR-20403-NGE-MKM, ECF. NO. 682, at 5-11 (E.D. Mich. Apr. 29, 2021), the court held that Ferguson's health conditions, susceptibility to COVID-19, good record of rehabilitation, and the sentencing disparity between him and his more culpable codefendant were extraordinary and compelling. Ferguson's co-defendant was granted clemency by President Trump on January 13, 2021, which then created a disparity with Ferguson. The court concluded that it would "be inequitable to require Defendant to complete the lengthy sentence originally imposed while the more culpable co-defendant, who initially received an even lengthier sentence, has been released." Id. at 10. See also United States v. Ezell, No. 02-815-01, 2021 U.S. Dist. WL 510293, at *8, (E.D. PA. Feb. 11, 2021) (reducing sentence of 132 years to 22 years for extraordinary and compelling reasons included an unduly harsh sentence, changes in the law, and a sentencing disparity with already released co-defendants); United States v. Edwards,

No. CR PJM 05-179, 2021 WL 1575276, at *2 (D. Md. Apr. 22, 2021) (reducing sentence and finding that sentencing disparity between the defendant and "his **less culpable co-defendants** qualifies as an extraordinary and compelling circumstance under § 3582(c)(1)(A)").

## V.    MR. DAIDONE'S INCARCERATION FOR THE ENTIRETY OF THE COVID-19 PANDEMIC

Mr. Daidone's imprisonment for the entirety of the COVID-19 pandemic was unusually harsh. It included extensive and extended lockdowns during which (among other things) he was not permitted outside his cell except for very limited periods of time and for very limited purposes. Family visitation was suspended for long stretches of time. He had only limited access to CorrLinks and therefore was unable to communicate with family and friends during an intensely frightening time. Access to counsel was severely restricted. Access to religious services/clergy was virtually non-existent. And the BOP suspended all rehabilitative programming. Perhaps most significantly, Mr. Daidone suffered severe isolation because of the quarantines and extended lock-downs that the BOP imposed as part of its (largely ineffective) efforts at controlling the spread of COVID-19, all the time worrying that he might "contract[] a once-in-a-century deadly virus." United States v. Johnson, Case No. 16-CR-319 (NGG), 2023 WL 3093617 (E.D.N.Y. Apr. 26,

2023). (Due to the prison he is housed in he is still under extreme lock-downs due to the violence at the prison.)

Such conditions of confinement and still others, all arising from the COVID-19 pandemic, made the conditions of confinement that Mr. Daidone endured over the past four-plus years far harsher than what the Court could possibly have imagined at sentencing – a COVID-19- related factor that numerous courts have found can contribute to a finding of "extraordinary and compelling reasons" for a sentence reduction, particularly for offenders (like Mr. Daidone) who were incarcerated for the entirety of the COVID-19 pandemic. See Reynolds v. United States, Case No. 99-CR-520 (NGG), 2022 WL 1444167, at 4-6 (E.D.N.Y. May 6, 2022) (finding that the harsh conditions of confinement arising from the COVID-19 pandemic, combined with the offender's age and substantial rehabilitation, constituted "extraordinary and compelling reasons" for a sentence reduction); United States v. Lora, Case No. 16-CR-44 (KPF), 2022 WL 1055749, at *5 6 (S.D.N.Y. Apr. 8, 2022) ("[P]andemic-induced conditions of confinement may constitute 'extraordinary and compelling' circumstances warranting compassionate release, particularly for defendants who have (i) served long sentence and (ii) been detained for the entirety of the pandemic"); United States v. Miranda, Case No. 12-CR-256 (GAG), 2021 WL 4592528, at *10 (D.P.R. Aug. 30, 2021) ("pandemic

conditions and [the offender's] medical history have made his punishment via confinement to this point harsher than it otherwise would have been").

## VI.    MR. DAIDONE'S REHABILITATION

Although 28 U.S.C. § 994(t) provides that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason" for a sentence reduction, rehabilitation is still relevant to the question of whether a sentence should be reduced pursuant to 18 U.S.C. § 3582(c)(1)(A). United States v. Torres, 464 F. Supp. 3d 651, 661 (S.D.N.Y. 2020), See also United States v. Marks 455 F. Supp. 3d 17 (W.D.N.Y. 2020), Judge David G. Larimer granted Marks's motion for compassionate release. In his decision, Judge Larimer highlighted the importance of considering an inmate's rehabilitation when evaluating such motions. He noted that "the Court must consider the defendant's post-sentencing conduct, including his rehabilitation, when evaluating compassionate release requests." This underscores that overlooking rehabilitation efforts could be an error in the compassionate release analysis.

Mr. Daidone has strived to become a better person even though he is serving a life sentence. Mr. Daidone has certainly changed his behavior, and thinking, as one would hope after more than 23 years in prison. Yet "[m]any defendants who pass through this Court ultimately become fully functioning members of society—they achieve, so to speak, rehabilitation." United States v. Torres, 464 F. Supp. 3d 651, 664 (S.D.N.Y. 2020). What is truly extraordinary and compelling about Mr. Daidone, however, is his devotion to his family, his change in character, and his desire to help others, and his rehabilitation. See Exhibit C. Mr. Daidone never passes up even the smallest opportunity to help the men around him and, in many instances, he has mentor them about doing the right thing and moral character.

The criminal justice system is not premised on the idea that conviction magically changes a person but, "[r]ightly or wrongly, . . . on the idea that a person can—and hopefully will—change after several years locked in prison." United States v. Lopez, Cr. No. 97-01117 ACK-2, 2020 WL 6298061, at *5 (D. Haw. Oct. 27, 2020) (quoting United States v. Ledezma-Rodriguez, 472 F. Supp. 3d 498, 506 (S.D. Iowa 2020)). Mr. Daidone's moral development took years of painful reflection and personal grief. Yet the results cannot be denied. First, and most fundamentally, Mr. Daidone understands and regrets the harm he has

caused. As Mr. Daidone writes to the Court, "there are not enough words in the world to truly reflect the depths of my regret and remorse." See Exhibit D.

Second, Mr. Daidone has a good disciplinary record. Courts have recognized how difficult it is to maintain such a record in the violent, stressful, and closely monitored environment of a federal prison. See, e.g., Lopez, 2020 WL 6298061, at *5 (citing authority from many Districts) ("Maintaining a clear disciplinary record is no minor feat in any prison, and that Lopez maintained that record in the face of a life sentence strongly supports the likelihood that he would remain a rule-abiding individual if released." (internal citations and alterations omitted)).

Mr. Daidone has gone to great lengths to better himself. He has engaged in numerous rehabilitative programs. Significantly, Mr. Daidone's rehabilitative efforts and accomplishments are distinct because he engaged in all such positive activities without any tangible incentive or potential benefit other than self-improvement given that his life sentence meant that he could not earn any "good conduct time" (or any other sentence reduction benefit) and given that he had no realistic hope of applying that which he learned behind bars in the "real world." See United States v. Lara, Case No. 95-CR-75 (JJM), 2023 WL 2305938, at *13 (D.R.I. Mar. 1, 2020) (reducing life sentence to time-served after 28 years imprisonment for a former Latin King convicted for his involvement in a carjacking that resulted in a murder, finding, among other things, that "the rehabilitation that Mr. Lara achieved

in prison is extraordinary and compelling (especially considering that Mr. Lara undertook these rehabilitative efforts expecting that he would still be serving a life sentence)"); United States v. Yu, Case No. 90-CR-47 (AT), 2020 WL 6873474 (S.D.N.Y. Nov. 23, 2020) (reducing life sentence to time-served after more than 30 years imprisonment for the operator of a large-scale international heroin trafficking operation based on, among other things, a finding that Mr. Yu had "spent nearly three decades trying to better himself, despite his life sentence, and without any tangible incentive other than self-improvement"). Simply put, Mr. Daidone, in the face of a life sentence, assumed a positive outlook and attitude towards life, sought to improve himself to the utmost extent possible and was motivated to do so even though he is serving a life sentence. It should be noted that over the nearly 23 years that he has been incarcerated Mr. Daidone has never been cited for violating the rules. This demonstrates that he is not a threat to public safety.

In denying compassionate release previously in this case the Court looked to the conduct of the underlining convictions. However, if compassionate release was premised on only the offense conduct and the character of what a defendant was over 20 years ago it is likely no one would be granted compassionate release. Many judges in this district, in the Eastern District and Courts across the country have given second chances for similar conduct to the conduct in the offense in this case through compassionate release.

See United States v. Thomas Reynolds, (99-CR-520, 5-6-2022). Thomas Reynolds was a soldier in the Bonanno crime family of La Cosa Nostra. (Gov't Opp'n (Dkt. 809) at 1-2.) In September 2000, he pleaded guilty to one count of racketeering in violation of 18 U.S.C. § 1962(c). (Id.) As part of his plea, he admitted to committing numerous predicates racketeering acts, including drug distribution, bank robberies and burglaries, extortion, attempted murder, **and several homicides.**

The Court granted a reduction in sentence despite the fact that there were several homicides finding that "a 36-year sentence is "sufficient, but not greater than necessary" to comply with the purposes of the federal sentencing factors, and this reduction is justified by extraordinary and compelling reasons, including pandemic-related conditions of confinement, Reynolds's rehabilitation, and his time served in state custody for the gun offense. Again, the Court granted an even further reduction after a second compassionate release was filed, reducing the sentence to 32 years. Today Mr. Reynolds is free and living in a federal halfway house.

See also United States v. Donato, 03-CR-929 (NGG), at *2 (E.D.N.Y. Feb. 16, 2024); in which this Court reduced the sentence on compassionate release. Between January 1979 until his arrest in November 2004, Mr. Donato participated

23

in illegal gambling operations as a member of the Bonnano organized crime

family. (Presentence Investigation Report ("PSR") (Dkt. 1415) ¶¶ 2, 3, 49, 55-59,

66.) For conduct connected to his role in the Bonnano Family, Mr. Donato

pleaded guilty on November 8, 2005 to two counts: (1) illegal gambling and (2)

**racketeering conspiracy predicated on attempted murder** and owning and

operating gambling businesses, in violation of 18 U.S.C. §§ 1955, 1962(d),

and 1963(a). (See Superseding Indictment S-3 (Dkt. 220 in No. 3-CR-929);

November 8, 2005 Min. Entry (Dkt. 375 in No. 3-CR-929); PSR ¶¶ 1-4, 66-69.)

On August 6, 2008, Mr. Donato pleaded guilty to conspiracy to commit murder in

aid of racketeering in violation of 18 U.S.C. § 1959(a)(5). (See Superseding

Indictment S-9 (Dkt. 464); Aug. 6, 2008 Min. Entry (Dkt. 509); PSR ¶¶ 5-7, 33-

34.) Mr. Donato was then sentenced to a 300-month (25 year) term of

imprisonment plus three years of supervised release. (Judgment (Dkt. 583).)

*In United States v. Holloway*, 68 F. Supp. 3d 310, 311 (E.D.N.Y. 2014); Judge

Gleeson was able to reduce a sentence by 30 years stating, ""Even people who are

indisputably guilty of violent crimes deserve justice, and now Holloway will get

it." Judge Gleeson recognized that some people do deserve a second chance.

In November 2024, U.S. District Judge Charlene Edwards Honeywell

granted Ronald J. Trucchio, a reputed Gambino crime family caporegime,

compassionate release from his life sentence. The decision was based on his

24

deteriorating health, age (73), and significant rehabilitation efforts during over two decades of incarceration. Judge Honeywell reduced his sentence to time served, imposing a ten-year term of supervised release. The court found that Trucchio's serious medical conditions and rehabilitation efforts indicated he posed a low risk of recidivism. *United States v. Trucchio*, No. 8:04-cr-348-CEH-TGW (M.D. Fla. Nov. 12, 2024).

The government in this case argued that "Even if this Court finds that Trucchio has established extraordinary and compelling circumstances within the meaning of section 1B1.13, it still should not reduce his sentence because he remains a danger to the community. As discussed above and as proven at separate trials in the Southern and Middle Districts of Florida, Trucchio has spent his adult life as a member of the Gambino Crime Family. Trucchio served first as an associate and soldier and later as a captain in the Gambino Crime Family. As an associate and soldier, Trucchio was involved in a wide array of criminal conduct, including major drug trafficking and violent crimes. As a Gambino Crime Family captain based in Ozone Park, New York, Trucchio supervised criminal crews that engaged in a wide pattern of racketeering activities spread across New York, New Jersey, Florida, and other locations.

The pattern of racketeering included murder, robbery, extortion, kidnapping, and drug distribution, among other crimes. Doc. 231 at 5-7; SDFL Doc. 262. Trucchio remains a Gambino Crime Family member. He has never repudiated the Gambino Crime Family, nor has he offered assistance to the United States in its efforts to dismantle that violent criminal organization. Indeed, Trucchio's unique role in that criminal organization will permit Trucchio, if released from prison, to supervise and engage in any manner of violent criminal conduct and drug trafficking, regardless of any existing disability or health complication. A ranking member of La Cosa Nostra, such as Trucchio, can initiate incredible criminal conduct with nothing more than a verbal order or gesture." (Dkt#1078 at 11-12). The Court, despite these arguments, granted Mr. Trucchio a second chance at life and an opportunity to spend what could be his last days with his family.

Others have also found a second chance that were involved in serious crimes in the New York area. For example, Joseph Testa, a former hitman for the Gambino crime family, was granted parole and released from federal prison on April 30, 2024, after serving 35 years of a life sentence. His release was not the result of a compassionate release decision but rather a parole granted by the United States Parole Commission (USPC). The USPC ordered his release in February 2024, and he was subsequently paroled in April 2024.

Similarly, Testa's codefendant Anthony Senter a notorious hitman for the Gambino crime family, was released from federal prison after serving 35 years of a life sentence. In June 2022, the United States Parole Commission (USPC) granted him parole, setting his release date for June 22, 2024. He was transferred to a halfway house in New York in December 2023, prior to his release. Others convicted of similar crimes have found second chances through compassionate release as well.

☐ **Vincent Asaro**: A reputed member of the Bonanno crime family, Asaro was granted compassionate release in April 2020 due to health concerns amid the COVID-19 pandemic. Judge Allyne R. Ross of the United States District Court for the Eastern District of New York. The case citation is *United States v. Asaro*, No. 17-CR-127 (ARR), 2020 WL 1903281 (E.D.N.Y. Apr. 17, 2020).

☐ Gregory **Scarpa Jr.**: An alleged caporegime in the Colombo crime family, Scarpa Jr. was granted compassionate release in November 2020 because of his deteriorating health due to cancer. *United States v. Scarpa*, No. 94-cr-1119-1 (ERK).

See also United States v. Vito Guzzo, Vito Guzzo's legal history is marked by his leadership of the Giannini Crew, a violent faction associated with multiple New York Mafia families. In September 1998, Guzzo pled guilty to an 18-count superseding information in the U.S. District Court for the Eastern District of New York. The charges included racketeering, racketeering conspiracy, five counts of murder in aid of racketeering, attempted murders, Hobbs Act robberies, and assaults with a dangerous weapon.

27

The murders spanned from 1992 to 1996 and involved victims such as drug dealers John Ruisi and Steven Pagnozzi, whom Guzzo and his crew executed during a robbery attempt. Other victims included Ralph Campione Sciulla, a Gambino associate, and Genovese associate John Borelli, who was dating Guzzo's ex-girlfriend In 1999, Guzzo was sentenced to 38 years in federal prison. Here Mr. Daidone has no release date. See also United States v. Neil Messina, Case No. 11-CR-31 (KAM), (EDNY). Neil Messina, a reputed associate of the Bonanno crime family, was released from federal custody earlier than his projected release date of June 18, 2027. His early release was facilitated by the First Step Act of 2018, which allows eligible inmates to earn time credits through participation in rehabilitative programs, thereby reducing their sentences. Messina had been serving an 18-year sentence for his involvement in a 1992 home invasion robbery that resulted in the death of Joseph Pistone Jr. He pled guilty in 2014 to racketeering charges, including extortion and operating an illegal gambling business. Although the prosecution recommended a 10-year sentence, the judge imposed an 18-year term, citing compelling evidence that Messina had ordered another fatal shooting in 1989. As of November 2024, Messina has been residing at a halfway house in Philadelphia, Pennsylvania. Messina was and is 62 years old much younger than Daidone with health conditions.

See United States v. Gerald Miller, (EDNY 10-2024). On June 21, 1993,
Gerald Miller was convicted after a seven-week jury trial of a host of crimes in
connection with his role as leader of the once infamous "Supreme Team," a
powerful cocaine-based trafficking organization that wielded substantial and
tyrannical power over parts of Queens County for nearly a decade. Miller's specific
criminal offenses include racketeering; criminally facilitating murder; engaging in
a continuing criminal enterprise involving more than 1500 grams of cocaine base;
conducting financial transactions with the proceeds of narcotics transactions; and
distributing and possessing with intent to distribute more than 50 grams of cocaine
base. Mr. Miller was also implicated in numerous murders and in fact implicated in
committing them himself. Despite this - the Court granted compassionate release,
and Mr. Miller was recently released from prison just months ago.

See Ramirez, 2021 WL 5233512, at *8, *10 (reducing sentence of "twice
murderer" and racketeer from 48 to 40 years in light of his "dreadful upbringing,"
his young age when he committed his crimes, and his rehabilitation, which
included participation in drug treatment, numerous classes, self-improvement
programs, and support of fellow inmates); United States v. Qadar, No. 00-CR603
(ARR), 2021 WL 3087956, at *8 (E.D.N.Y. July 22, 2021)."

For example, another Court reduced a life sentence to 30 years based on the
defendant's acceptance of responsibility for his crimes, his lack of disciplinary

infractions, his commitment to education, his volunteer work, and his mentorship.
Babb, 2021 WL 2315459, at *18-20. Judge Blake reduced a life sentence to time
served—26 years—in light of the defendant's remorse for his crimes, lack of
disciplinary infractions since 2013, support and mentorship of other prisoners, and
ties with his family. Gray, 2021 WL 1856649, at *4-6. Other courts have done the
same when faced with similar circumstances. Torres, 464 F. Supp. 3d at 660-64
(finding that defendants' rehabilitation and good deeds would likely warrant a
sentence reduction even absent the COVID-19 pandemic); Millan, 2020 WL
1674058, at *15 ("Mr. Millan's extraordinary rehabilitation, together with his
remorse and contrition, his conduct as model prisoner and man of extraordinary
character, his leadership in the religious community at FCI Fairton, his dedication
to work with at-risk youth and suicide prevention, and the support of BOP staff at
FCI Fairton . . . all constitute extraordinary and compelling reasons justifying a
reduction in sentence."); United States v. Plunk, 453 F. Supp. 3d 1308, 1314 (D.
Alaksa 2020) ("The recommendation letters, achievement certifications, and staff
evaluations clearly support that Defendant has taken his rehabilitation seriously
and that presents other reasons worth consideration for release.").

Courts have reduced life sentences for defendants of high moral character
even when that sentence was imposed for murder, See Gray, 2021 WL 1856649,
at *4 ("Gray's offense was, in a word, chilling. The evidence at trial showed that

Gray, at the behest of a drug dealer and with the prospect of some significant financial gain, planned and committed what amounted to the execution of Jamie Lee Waller."); Perez, 2021 WL 837425, at *5-6 (reducing life sentence, for procuring murder, to time served—23 years—based on health conditions and rehabilitation); United States v. Quinones, No. 00 Cr. 761-1 (JSR), 2021 WL 797835, at *2-4 (S.D.N.Y Feb. 27, 2021) (reducing life sentence, for torture and subsequent murder, to 35 years based on health conditions and extraordinary rehabilitation); United States v. Rodriguez, 492 F. Supp. 3d 306, 317 (S.D.N.Y. 2020) (reducing life sentence to 30 years, despite "the horrific nature" of the murder, based on rehabilitation and the risks and hardship imposed by the COVID-19 pandemic); Lopez, 2020 WL 6298061, at *4-6, *8 (reducing life sentence for murder to time served—23 years—based on extraordinary rehabilitation, youth at the time of offense, and numerous good deeds).

Mr. Daidone's moral development is no less significant. He feels great remorse for the suffering his criminal conduct had on others. See Babb, 2021 WL 2315459, at *19; Gray, 2021 WL 1856649, at *5; Lopez, 2020 WL 6298061, at *5; Torres, 464 F. Supp. 3d at 662; Millan, 2020 WL 1674058, at *8, *10. He has supported his family, despite the obstacles between him and them. See Quinones, 2021 WL 797835, at *3; Torres, 464 F. Supp. 3d 664. He has devoted significant time and effort to programing. See Babb, 2021 WL 2315459, at* 19 (describing

similar mentorship programs); Gray, 2021 WL 1856649, at *4 (describing the defendant's role in the Victim Awareness Program); cf. Lopez, 2020 WL 6298061, at *6 (noting the defendant's charity work); Millan, 2020 WL 1674058, at *12-14 (praising the defendant's service to other prisoners). He has had a positive impact on the lives of his peers, who consider him a role model. See Gray, 2021 WL 1856649, at *5; Lopez, 2020 WL 6298061, at *6; Rodriguez, 492 F. Supp. 3d at 312; Torres, 464 F. Supp. 3d at 662-63. See Babb, 2021 WL 2315459, at *19; Gray, 2021 WL 1856649, at *4; Quinones, 2021 WL 797835, at *2; Lopez, 2020 WL 6298061, at *4; Rodriguez, 492 F. Supp. 3d at 313; Torres, 464 F. Supp. 3d at 662; Millan, 2020 WL 1674058, at *9.

Mr. Daidone submits that there is nothing left to achieve in this case, by him remaining incarcerated besides punishment and a colossal waste of tax dollars and resources.

Mr. Daidone has a strong work ethic and has a good employment history as his circumstances permitted. He has maintained a job in prison and his dedication to change and becoming the change that he seeks to see in others. He has a strong belief in God and tries to live according to his moral values. See Gray, 2021 WL 1856649, at *5; Lopez, 2020 WL 6298061, at *4 & n.4; Millan, 2020 WL 1674058, at *12. He aspires, when and if released, to use his freedom to help others avoid the same mistakes that he made. See Lopez, 2020 WL 6298061, at

*6; Torres, 464 F. Supp. 3d at 663. See Gray, 2021 WL 1856649, at *5;

Quinones, 2021 WL 797835, at *3; Lopez, 2020 WL 6298061, at *4 n.4, *6

Rodriguez, 492 F. Supp. 3d at 311-12, 314; Millan, 2020 WL 1674058, at *14.

Some courts have held that sufficient moral development can exceed mere

rehabilitation and, by itself, constitute an extraordinary and compelling

circumstance. Torres, 464 F. Supp. 3d at 663-64 ("By any measure, the

[defendants'] good deeds exceed the bounds of what we consider 'rehabilitation.'

. . . The Court concludes that the [defendants'] contributions are, as the statute

requires, 'extraordinary and compelling.'"); Rodriguez, 492 F. Supp. 3d at 313

(citing id.) (same); see also Millan, 2020 WL 1674058, at *8-14 (describing the

moral characteristics that constituted extraordinary and compelling

circumstances); Lopez, 2020 WL 6298061, at *8 (finding extraordinary and

compelling circumstances based on the defendant's extraordinary rehabilitation,

his youth at the time of offense, "his minimal disciplinary record, his charity

work, his informal support for other inmates, his services in helping at-risk youth,

that he does not represent a danger to society, and the ongoing COVID-19

pandemic"). If this has ever been true of a defendant, it is true of Mr. Daidone.

Regardless, rehabilitation may combine with other factors to create extraordinary

and compelling circumstances. McCoy, 981 F.3d at 286 n.9. It does so here.

During his time in prison, Daidone has completed various courses that will be valuable to him upon release. Daidone's successful completion of prison educational programs makes him less likely to recidivate upon release.

See Lois M. Davis, et al., Evaluating the Effectiveness of Correctional Education: A Meta-Analysis of Programs That Provide Education to Incarcerated Adults, RAND CORP. (2013) (explaining, a meta-analysis of studies that evaluated correctional education and post-release recidivism found that "on average, inmates who participated in correctional education programs had 43 percent lower odds of recidivating than inmates who did not"). Daidone has also worked various jobs in prison showing his commitment to waking up every morning and going to work demonstrating his effort at real life skills training, Exhibit C. Daidone has used his time in prison wisely to gain valuable knowledge and skills that will allow him to contribute to society upon his release, Exhibit C.

Moreover in 2023 the United States Sentencing Commission also made clear that changes in law were a basis for Courts to revisit sentencing and impose a reduction. In pertinent part the amendments that went into effect on November 1, 2024 state;

**(6) UNUSUALLY LONG SENTENCES.** If a defendant received an **unusually long sentence** and has served at **least 10 years** of the term of imprisonment, a change in the law (other than an amendment to the guidelines

manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such a change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendants individualized circumstances.

Count Three of Daidone's indictment, charging the witness tampering murder of Bruno Facciolo, carried a mandatory "minimum" statutory sentence of "life in prison." So Daidone's conviction on that count prevented this Court from considering mitigating factors and imposing an individualized sentence under 18 USC § 3553(a). Put differently, it denied Daidone the benefit of US v. Booker, the watershed ruling that made the Sentencing Guidelines advisory, issued while his case was on direct appeal. If sentenced today the court would not be in a position wherein it was required to impose a life sentence. The life sentence mandate was part of the sentencing package doctrine. While this Court previously spoke on this in its denial it is possible that if sentenced today based on all of the factors this Court may not have imposed a life sentence or leave such in place.

Mr. Daidone has a family that loves and cares for him, See Exhibit E. They are ready and willing to assist Daidone with a successful reentry. If released Mr. Daidone would be living with his wife Theresa at 3329 Richmond Road Staten Island, NY 10306.

Daidone submits that he is no longer a threat to public safety. The biggest indicator of this is his commitment to rehabilitation, and dramatic character change. The Court should also consider whether, upon release, the defendant would pose "a danger to the safety of any other person or to the community." This Court is not faced with a stark choice between simply turning Daidone loose or continuing his incarceration. The Court has the option of reducing Daidone's period of incarceration, followed by a term of supervised release.

Supervised release, which is laid out at 18 U.S.C. § 3583, was created by Congress as "a form of post confinement monitoring overseen by the sentencing court." *Johnson v. United States*, 529 U.S. 694, 696-97 (2000). As the Supreme Court has explained, "Congress intended supervised release to assist individuals in their transition to community life. Supervised release fulfills rehabilitative ends," providing "individuals with post confinement assistance" through the supervision of the court. *United States v. Johnson*, 529 U.S. 53, 59 (2000). "The court can provide such assistance because, '[w]hile on supervised release, the offender [is] required to abide by certain conditions,' *Johnson v. United States*, 529 U.S. at 697, such as regularly reporting to a probation officer, pursuing schooling or work, and refraining from further criminal activity, *see* U.S.S.G. § 5D1.3(c); 18 U.S.C. § 3583(d)." *United States v. Island*, 916 F.3d 249, 253 (3d Cir. 2019). Congress

has also authorized supervising courts to revoke supervised release and order re-imprisonment when defendants fail to meet their release conditions. *See* 18 U.S.C. § 3583(e); *Johnson v. United States*, 529 U.S. at 697.

Supervised release is routinely imposed as a component of sentencing, including sentences for crimes far more serious than those of which Daidone has been convicted. Supervised release affords the court an array of conditions which it can impose, the defendant's compliance with which will be monitored by a probation officer. New conditions can be added as necessary. Beyond the low risk that Daidone now presents, whatever risk there is can be further mitigated by supervised release. *See United States v. Williams*, No. 04cr95, 2020 WL 1751545, at *3 (N.D.Fla. Apr. 1, 2020) (although court could not conclude that defendant posed no risk at all to public safety, "the risk of him engaging in further criminal conduct is minimal and can be managed through home confinement and the terms of his supervised release." In the event the Court is not inclined to grant a reduction of sentence to time served the Court could also reduce the sentence to a term of years while not releasing Mr. Daidone immediately. A term of 30 years would not allow Mr. Daidone to leave prison immediately but would provide an opportunity for him to be released eventually. There are numerous reasons that demonstrate extraordinary and compelling reasons to reduce the sentence in this case as outlined above.

## **CONCLUSION**

Mr. Daidone is asking this Court for compassion, and in asking for that compassion, he asks the Court to consider the fact that he made irrational and irresponsible decisions that he deeply regrets today. He is no longer that person. This Court now has the authority to reduce the sentence in this case based on the First Step Act and Sentencing Commission changes that place the power back into the hands of the people best suited to decide if a reduction is warranted – Federal Sentencing Court Judges.

Respectfully Requested,


Louis Daidone


April_____, 2025

EXHIBIT A

3-17-25
Sent out

Louis Napoleone
#34065-053
USP Coleman I
PO Box 1033
Coleman, FL 33521

Warden
USP Coleman I
PO Box 1033
Coleman, FL 33521



March 17, 2025

Louis Daidone
#39065-053
USP Coleman 1
USP COLEMAN I
U.S. PENITENTIARY
P.O. BOX 1033
COLEMAN, FL   33521


Warden
USP COLEMAN I
U.S. PENITENTIARY
P.O. BOX 1033
COLEMAN, FL   33521


Dear Warden,

I am writing to you to request that your office file a motion on my behalf for a reduction in sentence pursuant to 18 U.S.C. 3582. I believe that there are extraordinary and compelling reasons to reduce the sentence in my case. Those reason are (1) I am serving an overly harsh sentence that was premised on the mandatory guidelines, and if sentenced today I could be sentenced to a lower sentence, (2) my rehabilitation (3) the living conditions that I lived under due to COVID-19 have been overly harsh, (4) the fact that I can no longer take care of myself in the prison environment due to my age and medical issues that I have not been given proper medical attention for, (5) and the sentencing disparities with myself and codefendants.

If released I would be living with my wife Theresa at 3329 Richmond Road Staten Island NY 10306.

1

Respectfully Submitted,

Louis Daidone

2

EXHIBIT B

EXHIBIT C



## Individualized Needs Plan - Program Review   (Inmate Copy)

SEQUENCE: 00469367

Dept. of Justice / Federal Bureau of Prisons

Team Date: 05-23-2024

Plan is for inmate: DAIDONE, LOUIS  39065-053

| | | | |
|---|---|---|---|
| Facility: | COP  COLEMAN I USP | Proj. Rel. Date: | UNKNOWN |
| Name: | DAIDONE, LOUIS | Proj. Rel. Mthd: | LIFE |
| Register No.: | **39065-053** | DNA Status: | ALP01334 / 06-08-2011 |
| Age: | 78 | | |
| Date of Birth: | 02-23-1946 | | |

**Detainers**

| Detaining Agency | Remarks |
|---|---|
| *NO DETAINER* | |

**Inmate Photo ID Status**

| Full status incomplete - Expiration: null |
|---|

**Current Work Assignments**

| Facl | Assignment | Description | Start |
|---|---|---|---|
| COP | REC SPEC | RECREATION SPEC DETAIL | 03-29-2024 |

**Current Education Information**

| Facl | Assignment | Description | Start |
|---|---|---|---|
| COP | ESL HAS | ENGLISH PROFICIENT | 09-04-1992 |
| COP | GED HAS | COMPLETED GED OR HS DIPLOMA | 03-25-1992 |

**Education Courses**

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| COP | C | RE-ENTRY CLASS | 08-24-2023 | 08-24-2023 |
| ALP | C | HUMAN BODY & CHEM | 01-19-2022 | 01-30-2022 |
| ALP | C | PHYSICAL FIT AND BEHAVIOR MOD | 11-18-2021 | 12-02-2021 |
| ALP | C | URINARY AND REPRODUCTIVE SYSTS | 10-17-2021 | 10-31-2021 |
| ALP | C | NUTRITION, DIGESTIVE AND RESP | 08-25-2021 | 09-02-2021 |
| ALP | C | THE CARDIOVSCULAR AND THE LYMP | 07-23-2021 | 07-29-2021 |
| ALP | C | ENDOCRINE SYSTEM AND THE | 06-19-2021 | 07-02-2021 |
| ALP | C | NERVOUS SYSTEM | 05-15-2021 | 06-03-2021 |
| ALP | C | RHU FDIC $ SMART 11:FIN RECOVR | 03-11-2021 | 04-30-2021 |
| ALP | C | RHU FDIC $ SMART 10:OWN HOME | 03-11-2021 | 04-30-2021 |
| ALP | C | RHU FDIC $ SMART 9:LOAN | 03-11-2021 | 04-30-2021 |
| ALP | C | RHU FDIC $ SMART 8:CHARGE IT | 03-11-2021 | 04-30-2021 |
| ALP | C | RHU FDIC $ SMART 7:CREDIT | 03-11-2021 | 04-30-2021 |
| ALP | C | RHU FDIC $ SMART 6:KEEP SAFE | 03-11-2021 | 04-30-2021 |
| ALP | C | RHU FDIC $ SMART 4:$ MATTERS | 03-11-2021 | 04-30-2021 |
| ALP | C | RHU FDIC $ SMART 3:CHECKING | 03-11-2021 | 04-30-2021 |
| ALP | C | RHU FDIC $ SMART 2:BORROWING | 03-11-2021 | 04-30-2021 |
| ALP | C | RHU FDIC $ SMART 1:BANK ON IT | 03-11-2021 | 04-30-2021 |
| ALP | C | RHU ANIMAL ANATOMY 14:URINARY | 03-11-2021 | 04-30-2021 |
| ALP | C | RHU ANIMAL ANATOMY 13:DIGESTN | 03-11-2021 | 04-30-2021 |
| ALP | C | RHU EARLY NORTH AMERICA | 02-16-2021 | 04-30-2021 |
| ALP | C | ARTICULAR & MUSCULAR SYSTEM | 04-04-2021 | 05-06-2021 |
| ALP | C | THE CARDIOVSCULAR AND THE LYMP | 03-06-2021 | 03-27-2021 |
| ALP | C | RHU ACE US CONSTITUTION | 02-22-2021 | 02-26-2021 |
| ALP | C | RHU ENHANCING YOUR | 02-22-2021 | 02-26-2021 |
| ALP | C | RHU HISPANIC AMERICANS | 02-16-2021 | 02-26-2021 |
| ALP | C | RHU FAMOUS MALE SPORTS STARS | 02-08-2021 | 02-26-2021 |
| ALP | C | RHU EXPLORING GEOMETRY | 02-08-2021 | 02-26-2021 |
| ALP | C | RHU AMERICAN-INDIAN WARS | 01-07-2021 | 02-26-2021 |
| ALP | C | RHU AFRICAN AMERICAN HISTORY | 01-07-2021 | 02-26-2021 |
| ALP | C | RHU ACE GENDER EQUALITY | 11-02-2020 | 01-29-2021 |
| ALP | C | RHU ACE CLIMATE CHANGE COURSE | 10-07-2020 | 01-29-2021 |
| ALP | C | RHU ANIMAL ANATOMY 10:CIRCULAT | 10-15-2020 | 12-28-2020 |
| ALP | C | RHU ANIMAL ANATOMY 9:HEART | 10-15-2020 | 12-28-2020 |
| ALP | C | RHU ACE HISTORY MANIFEST DEST | 09-17-2020 | 10-30-2020 |



## Individualized Needs Plan - Program Review    (Inmate Copy)

Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: DAIDONE, LOUIS 39065-053

SEQUENCE: 00469367
Team Date: 05-23-2024

| SubFacl | Action | Description | Start | Stop |
|---------|--------|-------------|-------|------|
| ALP | C | RHU ACE GUIDE TO ONLINE SAFETY | 06-29-2020 | 10-30-2020 |
| ALP | C | RHU RESUME WRITING | 06-04-2020 | 10-30-2020 |
| ALP | C | SKELETAL SYSTEM | 10-10-2020 | 10-31-2020 |
| ALP | C | RHU OUR SOLAR SYSTEM | 05-14-2020 | 09-30-2020 |
| ALP | C | RHU EXPLORING EUROPE | 05-14-2020 | 09-30-2020 |
| ALP | C | TISSUES&INTEGUMENTARY | 08-30-2020 | 09-19-2020 |
| ALP | C | RHU ASVAB CAREER EXPLORATION | 07-27-2020 | 08-31-2020 |
| ALP | C | RHU ANIMAL ANATOMY 2:CLASSIFY | 08-11-2020 | 08-31-2020 |
| ALP | C | RHU ANIMAL ANATOMY 1:CHEMICAL | 08-11-2020 | 08-31-2020 |
| ALP | C | HUMAN BODY & CHEM | 08-06-2020 | 08-22-2020 |
| ALP | C | RHU EMAIL BASICS | 07-13-2020 | 07-30-2020 |
| ALP | C | MUSCULAR FLEXIBILITY & COMPRE | 07-05-2020 | 07-26-2020 |
| ALP | C | RHU PASS THE US CITZNSHP TEST? | 06-10-2020 | 07-15-2020 |
| ALP | C | RHU START A SMALL BUSINESS | 05-28-2020 | 06-16-2020 |
| ALP | C | STRESS MANAGEMENT | 05-16-2020 | 06-06-2020 |
| ALP | C | ACE WORLD WAR 2 HISTORY IN RHU | 05-21-2020 | 06-02-2020 |
| ALP | C | RHU WORLD WAR 1 | 05-21-2020 | 06-02-2020 |
| ALP | C | ACE EARTH SCIENCE FOR RHU'S | 05-07-2020 | 05-27-2020 |
| ALP | C | RHU MANY FACES OF AMERICAN REV | 05-07-2020 | 05-22-2020 |
| ALP | C | NUTRITION AND BODY COMP | 04-25-2020 | 05-10-2020 |
| ALP | C | ACE INTRO TO TYPING | 03-11-2013 | 04-18-2013 |
| ALP | C | ACE INTRO TO TYPING | 09-06-2011 | 10-20-2011 |
| ALP | C | SWISSBALL FITNESS MON 12:20PM | 09-30-2004 | 12-30-2004 |

## Discipline History (Last 6 months)

| Hearing Date | Prohibited Acts |
|--------------|-----------------|

*** NO INCIDENT REPORTS FOUND IN LAST 6 MONTHS ***

## Current Care Assignments

| Assignment | Description | Start |
|------------|-------------|-------|
| CARE1-MH | CARE1-MENTAL HEALTH | 09-24-2010 |
| CARE3 | UNSTABLE, COMPLEX CHRONIC CARE | 03-28-2023 |

## Current Medical Duty Status Assignments

| Assignment | Description | Start |
|------------|-------------|-------|
| PAPER | LEGACY PAPER MEDICAL RECORD | 11-07-2018 |
| REG DUTY | NO MEDICAL RESTR–REGULAR DUTY | 01-27-2010 |

## Current Drug Assignments

| Assignment | Description | Start |
|------------|-------------|-------|
| DRG I NONE | NO DRUG INTERVIEW REQUIRED | 08-09-2004 |

## FRP Payment Plan

| Most Recent Payment Plan |
|--------------------------|

**FRP Assignment:**    **NO OBLG    FINANC RESP-NO**                **Start: 08-05-2004**

Inmate Decision:  **AGREED**      **$25.00**          Frequency: **MONTHLY**
Payments past 6 months:      **$0.00**          Obligation Balance: **$0.00**

### Financial Obligations

| No. | Type | Amount | Balance | Payable | Status |
|-----|------|--------|---------|---------|--------|
| 3 | ASSMT | $500.00 | $0.00 | IMMEDIATE | COMPLETEDZ |
| | | *** NO ADJUSTMENTS MADE IN LAST 6 MONTHS *** | | | |
| 1 | FINE | $5,000.00 | $4,700.00 | IMMEDIATE | VOIDED |
| | | *** NO ADJUSTMENTS MADE IN LAST 6 MONTHS *** | | | |

## FRP Deposits



**Individualized Needs Plan - Program Review   (Inmate Copy)**
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: DAIDONE, LOUIS  39065-053

SEQUENCE: 00469367
Team Date: 05-23-2024

Trust Fund Deposits - Past 6 months:   $1,900.00        Payments commensurate ?   Y

New Payment Plan:   ** No data **

## Current FSA Assignments

| Assignment | Description | Start |
|---|---|---|
| AWARD | EBRR INCENTIVE AWARD | 12-07-2023 |
| FTC ELIG | FTC-ELIGIBLE - REVIEWED | 12-02-2019 |
| N-ANGER Y | NEED - ANGER/HOSTILITY YES | 05-21-2024 |
| N-ANTISO N | NEED - ANTISOCIAL PEERS NO | 05-21-2024 |
| N-COGNTV Y | NEED - COGNITIONS YES | 05-21-2024 |
| N-DYSLEX N | NEED - DYSLEXIA NO | 03-03-2022 |
| N-EDUC N | NEED - EDUCATION NO | 05-21-2024 |
| N-FIN PV N | NEED - FINANCE/POVERTY NO | 05-21-2024 |
| N-FM/PAR N | NEED - FAMILY/PARENTING NO | 05-21-2024 |
| N-M HLTH N | NEED - MENTAL HEALTH NO | 05-21-2024 |
| N-MEDICL Y | NEED - MEDICAL YES | 05-21-2024 |
| N-RLF N | NEED - REC/LEISURE/FITNESS NO | 05-21-2024 |
| N-SUB AB N | NEED - SUBSTANCE ABUSE NO | 05-21-2024 |
| N-TRAUMA N | NEED - TRAUMA NO | 05-21-2024 |
| N-WORK Y | NEED - WORK YES | 05-21-2024 |
| R-MIN | MINIMUM RISK RECIDIVISM LEVEL | 05-21-2024 |

## Progress since last review

Inmate Daidone has not completed any programs since last review. He has maintained clear conduct.

## Next Program Review Goals

Unit Team recommends Inmate Daidone enroll in at least 1 ACE/VT class by next review. He is further recommended to enroll in and complete the Anger Management class to address his FSA Need.

## Long Term Goals

Unit Team recommends Inmate Daidone to complete at least 2 ACE/VT classes by 12/2026.

## RRC/HC Placement

## Comments

Pts: +10
FTC: Eligible
Risk: Minimum

## FSA Recidivism Risk Assessment (PATTERN 01.03.00)

Register Number:39065-053, Last Name:DAIDONE

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| | |
|---|---|
| Register Number: 39065-053 | Risk Level Inmate....: R-MIN |
| Inmate Name |   General Level......: R-MIN (-2) |
|   Last.........: DAIDONE |   Violent Level......: R-MIN (1) |
|   First........: LOUIS | Security Level Inmate: HIGH |
|   Middle.......: | Security Level Facl..: HIGH |
|   Suffix.......: | Responsible Facility.: COP |
| Gender.........: MALE | Start Incarceration..: 06/29/2004 |

**PATTERN Worksheet Details**

Item: Programs Completed, Value: 40

General Score: -12, Violent Score: -4

Risk Item Data

| Category | Assignment | Start | | Stop | |
|---|---|---|---|---|---|
| EDC | TYPING | 03/11/2013 | 15:36 | 03/11/2013 | 15:36 |
| EDC | RHU-EARTHS | 05/07/2020 | 11:28 | 05/07/2020 | 11:28 |
| EDC | RHU-FACE | 05/07/2020 | 12:36 | 05/07/2020 | 12:36 |
| EDC | RHU-SOLAR | 05/14/2020 | 12:01 | 05/14/2020 | 12:01 |
| EDC | RHU-EXEU | 05/14/2020 | 14:34 | 05/14/2020 | 14:34 |
| EDC | RHU-WW1 | 05/21/2020 | 11:29 | 05/21/2020 | 11:29 |
| EDC | RHU-WW2 | 05/21/2020 | 12:07 | 05/21/2020 | 12:07 |
| EDC | RHU-STRTBS | 05/28/2020 | 00:44 | 05/28/2020 | 00:44 |
| EDC | RHU-RESUME | 06/04/2020 | 11:13 | 06/04/2020 | 11:13 |
| EDC | RHU-USCITZ | 06/10/2020 | 14:34 | 06/10/2020 | 14:34 |
| EDC | RHU-ONLN-S | 06/29/2020 | 11:14 | 06/29/2020 | 11:14 |
| EDC | RHU-EMAIL | 07/13/2020 | 14:40 | 07/13/2020 | 14:40 |
| EDC | RHU-CAREER | 07/27/2020 | 08:26 | 07/27/2020 | 08:26 |
| EDC | RHU-APA2 | 08/11/2020 | 14:40 | 08/11/2020 | 14:40 |
| EDC | RHU-APA1 | 08/11/2020 | 14:42 | 08/11/2020 | 14:42 |
| EDC | RHU-DESTNY | 09/17/2020 | 12:15 | 09/17/2020 | 12:15 |
| EDC | RHU-CLIMAT | 10/07/2020 | 11:12 | 10/07/2020 | 11:12 |
| EDC | RHU-APA9 | 10/15/2020 | 13:50 | 10/15/2020 | 13:50 |
| EDC | RHU-APA10 | 10/15/2020 | 13:53 | 10/15/2020 | 13:53 |
| EDC | RHU-GENDER | 11/02/2020 | 11:30 | 11/02/2020 | 11:30 |
| EDC | RHU-AFH | 01/07/2021 | 14:13 | 01/07/2021 | 14:13 |
| EDC | RHU-AIWAR | 01/07/2021 | 14:14 | 01/07/2021 | 14:14 |
| EDC | RHU-EXGEO | 02/08/2021 | 14:01 | 02/08/2021 | 14:01 |
| EDC | RHU-FMSPT | 02/08/2021 | 14:06 | 02/08/2021 | 14:06 |
| EDC | RHU-HISP | 02/16/2021 | 14:19 | 02/16/2021 | 14:19 |
| EDC | RHU-NAMER | 02/16/2021 | 14:57 | 02/16/2021 | 14:57 |
| EDC | RHU-VOCAB1 | 02/22/2021 | 14:11 | 02/22/2021 | 14:11 |
| EDC | RHU-USCONS | 02/22/2021 | 14:31 | 02/22/2021 | 14:31 |

## FSA Recidivism Risk Assessment (PATTERN 01.03.00)

Register Number:39065-053, Last Name:DAIDONE

**U.S. DEPARTMENT OF JUSTICE**                              **FEDERAL BUREAU OF PRISONS**

| | | | |
|---|---|---|---|
| EDC | RHU-MS1 | 03/11/2021 11:20 | 03/11/2021 11:20 |
| EDC | RHU-MS2 | 03/11/2021 11:21 | 03/11/2021 11:21 |
| EDC | RHU-MS3 | 03/11/2021 11:23 | 03/11/2021 11:23 |
| EDC | RHU-MS4 | 03/11/2021 11:25 | 03/11/2021 11:25 |
| EDC | RHU-MS6 | 03/11/2021 11:35 | 03/11/2021 11:35 |
| EDC | RHU-MS7 | 03/11/2021 11:47 | 03/11/2021 11:47 |
| EDC | RHU-MS8 | 03/11/2021 11:49 | 03/11/2021 11:49 |
| EDC | RHU-MS9 | 03/11/2021 11:51 | 03/11/2021 11:51 |
| EDC | RHU-MS10 | 03/11/2021 11:57 | 03/11/2021 11:57 |
| EDC | RHU-MS11 | 03/11/2021 11:59 | 03/11/2021 11:59 |
| EDC | RHU-APA13 | 03/11/2021 15:10 | 03/11/2021 15:10 |
| EDC | RHU-APA14 | 03/11/2021 15:11 | 03/11/2021 15:11 |

Item: Work Programs, Value: 0

General Score: 0, Violent Score: 0

Risk Item Data

No Data

---

**Assessment Date: 05/21/2024**                    **(2)**                    **Assessment# R-2146323718**

This Certificate Of Completion

Is Hereby Awarded To

Louis Dairdone

For His Successful Completion Of The

Introduction To Typing

Offered At USP Allenwood, PA

On This 18th Day Of April 2013
WPM 21

Mr. C. Johnson
ACE Coordinator

Mr. N. Craig
VT Coordinator

# *Certificate of Completion*

This certificate is awarded to

## Louis Daidone

In recognition of successfully completing the ACE course

## FDIC Money Smart for Older Adults

Total Hours: 28

_S. Kppu_
_____
**Instructor signature**

_9/28/2020_
_____
**Date**

123Certificates

EXHIBIT D

April 13, 2025

Louis Daidone
#39065-053
USP Coleman 1
USP COLEMAN I
U.S. PENITENTIARY
P.O. BOX 1033
COLEMAN, FL   33521


United States District Court
Honorable Judge Richard Berman
500 Pearl Street
Courtroom 17 B
New York, NY 10007-1312

Dear Judge Berman,

Finding a place to begin this letter seems to be the most difficult. But I think the
best place to begin is by saying I understand that you are not a person that is easily
fooled. I know that you have been on the bench for a while now and there have
been many people that have come before you that are seeking mercy and
sometimes simply grace. I too come before you Judge seeking the same. I am
prayerful that you will see the change in me and my character.

There is no doubt that I deserved to go to prison, and I must admit that I deserved a
very significant sentence for the irrational and irresponsible choices that I made in
life. Today I can tell you with honesty I regret every single one of them. Not
simply because I am in prison and have been for over 22 years but because of the
decisions, I made hurt so many people. I want to publicly apologize to the people
that I have harmed, the family members and my community. I was part of the
problem and not part of the solution. Today, Judge Berman, I can tell you that I am
deeply sorry for that. There are not enough words in the world to truly reflect the
depths of my regret and remorse. I am committed to never again making choices
that can hurt others, my community, my family, or myself.

I know that granting compassionate release is never an easy choice. Over the years
that I have been here I have seen many people that I have been incarcerated with

1

get that second chance and do great things with it. My hope is to be able to prove to you that I am worthy of a second chance as well. Failure is not an option for me in any way, shape or form. All I have to offer is my word to you that if given a second chance I will not let you down. I will not disrespect the US Attorney's office by committing any more crimes, or the other people behind me that are also seeking a second chance, nor my family or the people who have believed in and supported me over all these years.

If this case is just about punishment, then I deserve everything that was given but if it is also about change and self-betterment I want you to know that I have made those changes. I am now 79 years old and have spent many years of my life in federal prison. Things have not been easy for me the last few years with my health and being able to take care of myself. My hope is to have a chance to spend whatever little time I have left with my wife, daughter, grandchildren, and family.

Today, Judge Berman, instead of mercy I am asking you for grace. Sometimes people are simply given grace and today I ask for that in my request for a second chance to reclaim my life.

Respectfully,

Louis Daidone

EXHIBIT E

[REDACTED]